## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                No. CR 98-391 JB

MEL LAMBERT VELARDE,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Mel Lambert Velarde's Superseding Motion for a New Trial, filed September 27, 2004 (Doc. 309).  The Court held two evidentiary hearings on the motion on December 13, 2007 and February 11, 2008.  The primary issues are: (i) whether the Court should grant Velarde a new trial because the United States committed a <u>Brady</u> violation; and (ii) whether the Court should grant Velarde a new trial under <u>Sinclair</u> based on newly discovered evidence. While  the Court concludes that the United States did not possess the alleged <u>Brady</u> information, the Court finds that Velarde satisfies the requirements under <u>Sinclair</u> and  will thus grant Velarde's motion for a new trial.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).

1.      Velarde was the boyfriend of L.V.'s mother at the time of L.V.'s allegations, and

stayed in L.V.'s home occasionally, usually on weekends.   See Defendant Mel Velarde's Superceding Motion for New a Trial at 4, filed  September 27, 2004 (Doc. 309)("Defendant Mel Velarde's Superceding Motion for a New Trial").

2.      There was no physical evidence indicating that Velarde, or anyone else, committed this crime.  See id. at 2.

3.      There were no abrasions, cuts, bruises, tears, or marks anywhere on L.V.'s body.  See id. at 5.

4.      L.V. alleges that she fought Velarde by kicking, screaming, and trying to pull away. See id., Exhibit A,  at 255-56.

5.      There was not, however, any DNA evidence recovered from the scene that showed sexual assault.  See Defendant Mel Velarde's Superceding Motion for New Trial at 5.

6.      Tony Becerra was a history teacher at Dulce High School in Dulce, New Mexico on the Jicarilla Apache Reservation.  See Transcript of Hearing at 59:6-8, 60:3-4 (taken December 13, 2007)(Becerra & Lowry)("Tr.").[1]

7.       L.V. was one of Becerra's students in his New Mexico history class.  See id. at 62:4-8 (Lowry & Gallegos).

8.      Becerra will testify at trial that, on September 11, 2001, his students asked to go to the library to watch the news coverage of the September 11th events.  See id. at 65:11-13 (Becerra).

9.      Becerra will testify at trial that several students got on their knees and begged for him to let them go to the library to watch the news.  See id. at 65:16-17 (Becerra).

10.      Becerra will testify at trial that he did not, in any way, touch the kids, including L.V.,

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

who were down on their knees begging to go to the library.  See id. at  65:24-25 (Lowry & Becerra).

11.     Becerra will testify at trial that, after he finished taking role, he took his students to the library.  See id. at 65:18-20 (Becerra).

12.     Becerra will testify at trial that he did not force his students to get on their knees and beg, that he would never force his students to do anything, and that he would not make them uncomfortable in class.  See id. at 69:2-8 (Lowry & Becerra).

13.     Becerra will testify at trial that L.V. made an allegation that, during class on September 11, 2001, Becerra engaged in inappropriate conduct by making her get on her knees and beg.  See id. at 67:15-17 (Becerra & Lowry).

14.     Becerra will testify at trial that L.V.'s allegations prompted the principal, Bill Reese, to call Becerra to his office, where Becerra had to defend his conduct before Reese, L.V., and L.V.'s mother.  See id. at 66:19-67:23 (Becerra & Lowry).

15.     Antonio Pena, the acting assistant principal of Dulce Schools, will testify at trial that, on September 11, 2001, L.V. came into his office and alleged that Becerra would not let them go to the library to watch the news coverage of September 11, 2001 unless they got down on their knees and begged, and that in the process of this conduct Becerra touched L.V. as he helped her up.  See id. at 83:12-19; id. at 84:8-85:9 (Pena & Schoenburg).

16.     Pena will testify at trial that, in response to L.V.'s allegation, he notified the Superintendent, who told Pena to take care of the discipline issues and that he would have Reese look into the personnel issues. See id. at 85:13-86:3 (Pena & Schoenburg).

17.     Phillip Gallegos, a teacher, the National Education Association ("NEA") teacher-union representative, and coach at Dulce Schools, will testify at trial that, on September 11, 2001, Becerra told him that he had been called into Reese's office and that L.V. had accused him of

inappropriate conduct or inappropriate touching. <u>See</u> <u>id.</u> at 100:21-101:9; <u>id.</u> at 105:5-16 (Gallegos & Schoenburg).[2]

18.     Reese will testify at trial that an incident involving Becerra and L.V. was brought to his attention on September 11, 2001. <u>See</u> Transcript of Hearing at 14:11-15 (taken February 11, 2008)("Tr.2")(Schoenburg & Reese).

19.     Reese will testify at trial that Becerra and three girls, one of them being L.V., came into his office on September 11, 2001 with an issue involving the girls getting down on their knees and begging Becerra to let them watch the news coverage of the September 11th events. <u>See</u> <u>id.</u> at 14:3-10 (Reese).

20.     Gallegos will testify at trial that he had several conversations with Reese regarding the allegations that L.V. made against Becerra. <u>See</u> Tr. at 104:9-22; <u>id.</u> at 105:17-106:13 (Pena & Schoenburg).

21.     Reese will testify at trial that, when he looked into L.V.'s allegations against Becerra, he determined that Becerra had done nothing improper towards any of the girls and that Becerra wanted only for the girls to go to class. <u>See</u> Tr.2 at 18:9-12 (Schoenburg & Reese).

22.     Becerra will testify at trial that, during the investigation of the allegations against him, L.V. stated that she had not reported the Becerra incident to Pena. Becerra will testify that, when Reese asked L.V. why she did not tell Pena about the incident with Becerra, she stated:

_____

[2] During the evidentiary hearing on December 13, 2007, Gallegos stated that "[Becerra] mentioned to me that he had been called into the principal's office and that the young lady had accused him of inappropriate touching or inappropriate conduct, something along that line." Tr. at 101:4-7 (Becerra). Later during cross examination, however, Schoenburg asked Gallegos how Becerra had described the allegations against him on September 11, 2001. <u>See</u> <u>id.</u> at 105:5-15 (Schoenburg & Becerra). Gallegos replied: "As inappropriate touching, is what I recall." <u>id.</u> at 105:16 (Gallegos).

"[B]ecause he scares me . . . because he touches me."  Tr. at 68:1-5 (Becerra).

23.     Gallegos will testify at trial that, Becerra told him that L.V. had made allegations against Pena of inappropriate touching.  See id. at 104:23-105:4 (Schoenburg & Gallegos).

24.     Gallegos will testify at trial that Reese told him that the inappropriate touching allegation against Pena was based on the fact that Pena gave a hug to all of the children in the morning.  See id. at 105:17-106:13 (Schoenburg & Gallegos).

25.     Pena will testify at trial that he determined that Becerra had not done anything improper to L.V.  See id. at 87:9-17 (Pena & Schoenburg).

26.     Pena will testify at trial that, he was not aware that L.V. had accused him of improper touching until he was later informed by the defense investigator.  See id. at 88:4-8 (Schoenburg & Pena).

27.     Reese will testify at trial that, he determined that Becerra had not done anything improper towards L.V.  See Tr.2 at 18:9-12 (Schoenburg & Reese).

28.     Frank Chimits is a Special Agent with the Federal Bureau of Investigation ("FBI").  See Affidavit of Frank Chimits ¶ 2, at 1 (executed October 29, 2004), filed November 1, 2004 (Doc. 315)("Chimits Aff.").

29.     Chimits has been employed by the FBI since 1985.  See id. ¶ 3, at 2.

30.     In September 2001, Chimits was stationed in the FBI's Farmington Residence Agency.  See id.

31.     Chimits was the assigned investigating agent, or "case agent," before the United States District Court for the District of New Mexico in the criminal case styled United States of America versus Defendant Mel Lambert Velarde, No. CR 98-0391 LH.  Id. ¶ 2, at 1.

32.     In March of 1999 Velarde had his first jury trial before the Honorable John E.

Conway.  See Clerk's Minutes, filed March 23, 1999 (Doc. 119).

33.     On March 29, 2001 the jury found Velarde guilty.  See Verdict, filed March 29, 2001 (Doc. 127).

34.     The United States Court of Appeals for the Tenth Circuit reversed and remanded the decision of the district court, holding that the testimony of several witnesses was impermissible and not harmless error.  See United States v. Velarde, 214 F.3d 1204, 1209-12 (10th Cir. 2000).

35.     On September 6, 2000, Velarde's case was reassigned to the Honorable C. Leroy Hansen, United States District Judge.  See Minute Order, filed September 6, 2000 (Doc. 156).

36.     On August 23, 2001, Judge Hansen denied Velarde's motion to dismiss because of a Brady violation and postponed  the August 21, 2001 trial date.  See Order for Continuance, filed August 23, 2001 (Doc. 240).

37.     Judge Hansen postponed the trial so that Velarde's counsel could investigate allegations  that teachers within the Dulce school system were having problems with L.V. not being honest. See Motion to Dismiss for Brady Violation, or, in the Alternative, a Continuance of Trial, filed August 17, 2001 (Doc. 233); Government's Response to Defendant's Motion for Dismissal for Brady Violation, or in the Alternative, a Continuance of Trial, Exhibit B, filed August 17, 2001 (Doc. 235); Order for Continuance, filed August 23, 2001 (Doc. 240).

38.     Before Velarde's September 2001 trial, Chimits was asked to seek out teachers and other people with whom L.V. interacted to get their opinion of  L.V.'s truthfulness or veracity.  See Tr. at 23:3-10 (Schoenburg & Chimits).

39.     On September 18, 2001, Chimits went to Dulce and interviewed Angelita Veneno, William DeBoer, and Ina Montoya.  See id. at 27:8-12 (Schoenburg & Chimits).

40.     Around September 18, 2001, Chimits went to Dulce Schools, at the request of L.V.'s

mother, to speak to Reese about allowing L.V.'s brother to be excused from football practice so that he could attend L.V.'s trial. See id. at 32:9-33:7 (Schoenburg & Chimits).

41.    During the meeting between Chimits, L.V.'s mother, and Reese, at Reese's request, Gallegos, the football coach, came to Reese's office to discuss whether L.V.'s brother could be excused from practice without it affecting his ability to play in that week's game. See id. at 33:9-17 (Chimits).

42.    Gallegos is a former police officer. See id. at 98:5-20 (Gallegos & Schoenburg).

43.    Before beginning his employment with Dulce High School, Gallegos had been employed b the Jicarilla Tribal Police Department in Dulce, New Mexico. See Affidavit of Phil Gallegos ¶ 3, at 1 (executed December 1, 2004)("Gallegos Aff.").

44.    Chimits and Gallegos knew each other before their involvement with one another regarding this case. See Chimits Aff. ¶ 5, at 2.

45.    Chimits and Gallegos had, on previous occasions, worked with each other on unrelated law-enforcement matters when Chimits was assigned to the Farmington Residence Agency. See id.

46.    Because of Gallegos' status as an NEA union representative, and because of his friendship with Becerra, Gallegos became aware, both formally and informally, that L.V. had made false allegations of inappropriate touching against Becerra and Pena. See Gallegos Aff. ¶ 2, at 1.

47.    When Gallegos arrived at Reese's office, Reese, Chimits, and L.V.'s mother were already present. See Gallegos Aff. ¶ 5, at 2.

48.    L.V.'s mother was seated, and she apparently had just concluded her meeting with Chimits and Reese. See id.

49.    Chimits then spoke to Gallegos about L.V.'s brother missing football practice

because of the court proceedings.  See Tr. at 34:16-19 (Schoenburg & Chimits).

50.     After the meeting in Reese's office was finished, Chimits and Gallegos had a conversation, just between the two of them, outside of Reese's office in the teacher's lounge.  See id. at 34:19-23; id. at 35:3-5  (Chimits & Schoenburg); Gallegos Aff. ¶ 6, at 2.

51.     During the conversation between Chimits and Gallegos, Gallegos told Chimits that L.V. had recently been in trouble at school and asked Chimits if he was aware of the trouble.  See Tr. at 35:8-19 (Schoenburg & Chimits).

52.     Gallegos had the impression that Chimits already knew of L.V.'s false accusations at school.  See id. at 113:3-12 (Schoenburg & Gallegos).

53.     Chimits thought Gallegos' reference to trouble referenced the trouble involving L.V. which he had previously been told about by L.V.'s teacher and Pena; Chimits did not know about the false accusations.  See id. at 35:6-38:2 (Schoenburg & Chimits); id. at 47:13-49:19 (Carson McNabb & Chimits).  The incomplete conversation led to a miscommunication, in that Gallegos had the impression that Chimits knew more than he did and in that Chimits thought Gallegos was talking about something he knew about. [3]  See Tr. at 35:6-38:2 (Schoenburg & Chimits); id. at 47:13-49:19 (Carson McNabb & Chimits); id. at 113:3-12 (Schoenburg & Gallegos).

54.     Gallegos did not describe the trouble L.V. had been in other than telling Chimits that

_____

[3] The United States ultimately represented to the Court that when Gallegos told Chimits about the "trouble" in which L.V. had been involved, Chimits understood the "trouble" to mean specific trouble of which he was already aware and for that reason did not pursue the trouble further. Tr. at 216:18-217:13 (Fouratt). The Court concludes that the evidence before  it suggests that Chimits did not further investigate the "trouble" referred to by Gallegos because he believed that he already knew about the trouble to which Gallegos was referring because of his prior conversations with L.V.'s teacher and Pena.

L.V. was sent to the principal's office.  See id. at 35:20-22 (Schoenburg & Chimits).[4]

55.     At the time of the conversation between Chimits and Gallegos, Chimits already knew that L.V. had been in trouble at school.  See id. at 36:7-11 (Chimits & Schoenburg).

56.     A day or two before Gallegos spoke to Chimits outside of Reese's office, Chimits went to Dulce School to alert L.V.'s teacher to L.V.'s situation with the pending trial and to let the teacher know that L.V. was going to have to testify.  See id. at 36:9-37:8; id. at 38:10-13 (Schoenburg & Chimits).

57.     During Chimits' conversation with L.V.'s teacher,  L.V.'s teacher told Chimits that, while she had a substitute teacher teaching for her, L.V. had misbehaved and had done something in the classroom that had caused her to be sent to the principal's office.  See id. at 36:9-20 (Chimits).

58.     L.V.'s teacher told Chimits that it was her understanding that L.V. had been disruptive in class.  See id. at 48:22-24 (Carson McNabb & Chimits).

59.     A day or two after Chimits had spoken to L.V.'s teacher, he spoke to Pena about the trouble L.V. had gotten into and confirmed with him that L.V. had been sent to the office and that Pena had talked with her.  See id. at 48:25-49:19; id. at 55:16-22 (Carson McNabb & Chimits).

60.     Pena did not mention to Chimits that the trouble that L.V. had been in involved any sort of sexual touching.  See id. at 49:7-10 (Carson McNabb & Chimits).

61.     Chimits was never told that L.V. accused any person of sexual assault, or sexual misconduct, or that she had made false accusations against male teachers.  See id. at 39:20-40:12

---

[4] Gallegos testified that he specifically communicated to Chimits that L.V. had made false allegations of inappropriate touching against two individuals at the school.  See Gallegos Aff. ¶ 6, at 2.  Gallegos further testified that he asked Chimits if he was aware of these false allegations.  See id.  Gallegos stated that Chimits' reaction gave him the feeling that Chimits was already aware of L.V.'s false allegations.  See id. ¶ 7, at 2.

(Schoenburg & Chimits).

62.     No one, including Gallegos, mentioned to Chimits that the trouble in which L.V. had been involved implicated sexual touching.  See id. at 48:2-4 (Carson McNabb & Chimits).[5]

63.     Chimits was not aware of L.V.'s false allegations. See Chimits Aff. ¶ 5, at 2.

64.     Chimits did not, at any time, have a conversation with Gallegos in which Gallegos stated that L.V. had accused any person of sexual assault, or any sexual misconduct towards her, other than Velarde.  See id.

65.     No person ever made any statement to Chimits that, in any way, conveyed to him that L.V. had accused any person, other than Velarde, of sexual assault or of any sexual misconduct toward her.  See id.

66.     No information about L.V. wrongly accusing any person of sexual misconduct was conveyed to Chimits.  See id.

67.     Had Chimits received information that L.V. had accused any person of sexual
        assault,

or any sexual misconduct toward her, Chimits would have immediately informed the Assistant United States Attorneys assigned to prosecute Velarde.  See id.

68.     Chimits was not aware of the newly discovered evidence before the retrial began. See Chimits Aff. ¶¶ 4, 5, at 1-2.

69.     Chimits did not forward the information within Gallegos' knowledge about L.V.'s

––––––––––––––––––––

[5] While Chimits' and Gallegos' memory of the conversation in the teacher's lounge is very similar, the two disagree whether Gallegos explained the trouble L.V. was involved in as involving false allegations of inappropriate touching against two individuals at the school.  While the Court believes both individuals are credible, it finds that Chimits memory of how the trouble was explained to him to be more accurate than Gallegos' memory of the situation.

sexual accusations against males to the prosecution or to the defense counsel as the Supreme Court requires under <u>Kyles v. Whitley</u>, because Chimits did not possess the same information.  <u>See</u> Chimits Aff. ¶ 5, at 2; Tr. at 48:2-12 (Schoenburg & Chimits).

70.     During Chimits' conversation with Gallegos in the teachers lounge, Gallegos also informed Chimits that the Jicarilla police officers who initially investigated L.V.'s allegations against Velarde had themselves been involved in allegations of misconduct, including allegations of sexual misconduct with minors.  <u>See</u> Gallegos Aff. ¶ 8, at 2.[6]

71.     Chimits  probed further into the information Gallegos gave him about the Jicarilla police officers and spoke with the chief of police for the Jicarilla tribe.  <u>See</u> Tr. at 51:1-8 (Schoenburg & Chimits).

72.     After speaking with the chief of police for the Jicarilla tribe, Chimits made the determination that the information given to him by Gallegos, had no impact on the investigation concerning Velarde.  <u>See</u> <u>id.</u> at 51:9-18 (Carson McNabb & Chimits).

73.     At the September 2001 trial, Velarde's counsel argued that L.V. was motivated to fabricate the charges against Velarde because Velarde ruined L.V.'s ability to be with her mother all of the time, and that L.V. was not able to sleep with her mother when Velarde spent the night and she was frightened to sleep alone.  <u>See</u> Defendant Mel Lambert Velarde's Reply in Support of his Motion for a New Trial, filed May 6, 2005 (Doc. 334)("Defendant Mel Lambert Velarde's Reply in Support of his Motion for a New Trial").

74.     In September of 2001, Velarde had a second jury trial before Judge Hansen.  <u>See</u>

---

[6] Chimits contends that he knows he had a conversation with Gallegos of this nature but does not remember if it took place on the same day that he and Gallegos were in Reese's office.  <u>See</u> Tr. at 50:15-25 (Carson McNabb & Chimits).

Clerk's Minutes at 1, filed September 25 (Doc. 267).

75.     L.V. underwent cross-examination at trial. <u>See id.</u> at 4-5; United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial, filed October 29, 2004 (Doc. 314)("United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial").

76.     According to Velarde, at the trial, the only line of questioning directed to L.V. about her tendency to falsify stories was the following:

Q:     Did you make up a story about Jessica, your cousin, got her in trouble in school once?

A:     My cousin Jessica?

Q:     I'm sorry, your cousin Jessica.  Do you remember that?

A:     She was in probably kindergarten by then.

Q:     Okay.  Tell us about that.  What happened?

A:     I don't know what you're talking about.

Q:     You made up a story about her that got her into trouble in school; do you remember that?

A:     No.

Defendant Mel Lambert Velarde's Reply in Support of His Motion for a New Trial at 4-5 (citing Transcript of Proceeding at 284-285 (taken September 25, 2001)).

77.     The impeachment evidence presented against L.V. by Velarde's counsel was limited to comments regarding L.V.'s inability to tell the truth about chewing gum in her school classroom and her tendency to lie about finishing her school work. <u>See</u> Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 5 (citing Trial Transcript at 581, 593).

78.     The United States called three character witnesses at trial to testify that, in their

opinion, L.V. was a truthful girl. <u>See</u> Defendant Mel Velarde's Superceding Motion for New Trial at 5.

79.     Two of the witnesses were Amy Own and Kate Bagby, who were L.V.'s school teachers in Dulce, New Mexico.  <u>See</u> <u>id.</u>

80.     Trudy Harrison, another witness, told jurors that, when she was a child -- about the same age as L.V. when L.V. was exploited -- Velarde committed the same offense in a similar manner to her. <u>See</u> United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for New Trial at 5.

81.     Harrison described for the jury acts which were premeditated and which she suffered from Velarde.  <u>See</u> <u>id.</u> (citing Transcript of Hearing at 339-68 (taken September 2001)).

82.     Harrison detailed Velarde's plan to trick her into being alone with him so that they could "see some rabbits," and recalled that he had a "blanket over his right shoulder," which he then lay on the ground before abusing her.  United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for New Trial at 5 (citing Transcript of Hearing at 343 (taken September 2001)).

83.     Harrison recalled with detailed specificity the illegal sexual contact, the location where she was abused, and that it was Velarde who abused her.  <u>See</u> United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for New Trial at 5.

84.     Harrison's testimony, however, was not without its problems.  <u>See</u> Defendant Mel Lambert Velarde's Reply in Support of His Motion for a New Trial at 5.

85.     Harrison alleged that she had been assaulted twenty years before L.V.'s case, and Harrison waited the full twenty years before she told anyone in her family that Velarde had assaulted her. <u>See</u> <u>id.</u>

86.     Harrison's family had a longstanding feud with Velarde's family over whose family would possess and control one of the largest working ranches on the Jicarilla Apache Reservation. See id..

87.     At the time of trial, Velarde's family had control over the ranch, and Velarde was the ranch's primary caretaker. See id.

88.     During the United States' closing argument during the second trial, the Assistant United States Attorney suggested that it would have been very difficult for L.V. to concoct a complex, multilayered lie accusing Velarde of raping her, and that it was more likely that Velarde raped her than it was she was that she was able to create such a lie.  See Letter to the Court from Velarde, filed February 25, 2008 (Doc. 412)("Velarde Letter").

89.     Velarde was convicted at the 2001 trial.  See Verdict, filed September 27, 2001 (Doc. 269).

90.     In August 2002, Chimits was reassigned to FBI headquarters in Washington, D.C. See Chimits Aff. ¶ 3, at 1.

91.     Chimits is now assigned to San Antonio, Texas.  See Tr. at 19:7-10 (Schoenburg & Chimits).

92.     Gallegos currently spends a portion of his time in San Antonio, Texas, and a portion of it in Farmington, New Mexico.  See id. at 96:13-15 (Gallegos).

93.     The Court was impressed with Chimits' personal knowledge of the facts about which he testified.  See id. at 19:7-57:4 (Schoenburg, Chimits & Carson McNabb).

94.     The Court credited most of Gallegos' testimony, except for his testimony that he told Chimits that L.V. had made false accusations of inappropriate touching against school employees and that such information had Brady implications.  See Tr. at 112:2-113:19 (Schoenburg &

Gallegos).

95.     Velarde has now been convicted twice.  <u>See</u> Verdict, filed March 29, 1999 (Doc. 127); Verdict, filed September 27, 2001 (Doc. 269).

96.     When Velarde moved for a new trial, he did not provide a sworn statement nor a school document.  <u>See</u> Defendant Mel Velarde's Superceding Motion for a New Trial.

97.     In contrast to Velarde's motion, the United States attached to its response an affidavit from Chimits.  <u>See</u> United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for  a New Trial, Exhibit A, Chimits Aff..

98.     Chimits' sworn statement contradicts the assertion that he acquired information about L.V. wrongly accusing any person of sexual misconduct.  <u>See</u> Chimits Aff. ¶ 5, at 2.

99.     On October 29, 2004, the United States filed its Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial.  <u>See</u> Doc. 314.

100.    One of the United States' primary contentions was that the Court cannot rule  in Velarde's favor because his motion lacked factual support for the allegations asserted therein. <u>See</u> United State's Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 3.

101.    By May 6, 2005, Velarde's counsel had learned that documentary evidence which may have been available to support his motion was probably destroyed under routine school procedures.  <u>See</u> Defendant Mel Lambert Velarde's Reply in Support of His Motion For a New Trial, Exhibit B, Letter from Loren Cushman, Superintendent of Dulce Independent Schools (dated April 28, 2005).

## <u>PROCEDURAL BACKGROUND</u>

An indictment was filed in this case on June 4, 1998.  <u>See</u> Indictment, filed June 4, 1998

(Doc. 1).  In March of 1999, Velarde had his first jury trial before Judge Conway, then-Chief United

States District Judge, and was found guilty.  See Verdict, filed March 29, 1999 (Doc. 127).  Velarde

appealed his conviction, and the United States Court of Appeals for the Tenth Circuit reversed and

remanded the decision of the district court holding that the testimony of several witnesses was

impermissible and not harmless error.  See United States v. Velarde, 214 F.3d 1204, 1209-12 (10th

Cir. 2000).

       In September of 2000, Velarde's case was reassigned to Judge Hansen.  See Minute Order,

filed September 6, 2000 (Doc. 156).  In September of 2001, Velarde had his second jury trial.  See

Clerk's Minutes, filed September 25, 2001 (Doc. 267). Given that there was no physical evidence

suggesting that Velarde, or anyone else, sexually abused  L.V., the pivotal issue during Velarde's

trial was L.V.'s credibility.  See Defendant Mel Lambert Velarde's Superceding Motion for New

Trial ¶ 4, at 2. The jury found Velarde guilty of aggravated sexual abuse of L.V. as charged in the

indictment.  See Verdict, filed September 27, 2001 (Doc. 269).  Once again, Velarde appealed the

district court's decision.  See Notice of Appeal, filed May 14, 2002 (Doc. 298).  The Tenth Circuit

affirmed the decision of the District Court.  See United States v. Velarde, 88 Fed.Appx. 339, 346

(10th Cir. 2004).

       During its closing argument in the second trial, the United States suggested that L.V. was

incapable of concocting a lie about sexual assault by Velarde:

> The question is, did [L.V.] lie?  What must be true if she lied?  Let's look at that
> critically.  First, she must be a diabolical mastermind because she set up this whole
> thing by pretending to love this man for six months, by pretending to have a father-
> daughter relationship, by pretending that he might be her new dad.  Brilliant.  It's
> either brilliant or she really did love and trust him before he raped her.
>
> She didn't pick the obvious.  She didn't say, well, he hit me, which is what she
> would have learned worked from her last experience with dad.  When you hit people,
> you leave.  No, she crafted a brilliant lie about child sexual abuse.  She was either a

-16-

creative genius, or she was raped by Mel Velarde.  She knew enough to delay the report like most kids do in that situation, out of fear, just like real victims.  So she's either clever and calculating, or she delayed because she was abused, and she was frightened . . . . So she's either a criminal genius, or Mel Velarde raped her and she was just trying to describe what he did to her in [her] own language.

She would have had to have known that her description of the event couldn't be contradicted by medical evidence for this lie to work.  You all now know, Dr. Ornelas knows that, but how would an eight-year-old girl know that?  She's either psychic or well versed in medical examination of child sexual abuse victims or she was raped by Mel Velarde.

She had to know that Mel was strong enough to lift her from the beds she's either a keen judge of physical capabilities or she was raped.

She would have to [have] known that her brothers wouldn't contradict her, because if just one of them came forward, we've heard the defense version that they were angry at each other and fighting, all it would take was one of them to say well I was awake, I heard Mel go to the bathroom and go back to bed, it never happened, that's all it would take, so she's either a psychic and knows what they're going to say or it really happened the way she said it was, she was raped by Mel Velarde . . .

 . . . She knew enough to pick a night when he was up longer than a moment so she's either creating complex multilayered lies or she was raped by Mel Velarde.  She had to play her part to perfection including pretending to be reluctant to tell the doctor what happened when she went to see her, so she's either an excellent actress or she was embarrassed because she was raped.

And she had to come in here and give you a world class performance.  She had cry when she described the horrible parts.  She had to look like she was reliving the terror for you to look normal so she's either the greatest actress of our generation or she was describing being raped by Mel Velarde and she had to be the luckiest lie liar on earth to lie about a man who has a niece who would then come up with a virtually similar lie and be willing to come in her[e] and tell you about it, so she either had a brilliant plan and she's a masterful actor or she's the little girl we know who, when she lies tells small fibs and very poor ones that can be seen through in a heartbeat, or it really happened, Mel Velarde forced his penis in her vulva, put his hand over her mouth.

Velarde Letter at 4-5 (citing Trial Transcript, Vol 4. at 740-41).

On September 27, 2004, three years to the day from the jury's guilty verdict, which was returned September 27, 2001, Velarde filed his Superceding Motion for New Trial.  See Doc. 309.

-17-

In his Superceding Motion for New Trial, Velarde alleges that, in the Spring of 2004, after the completion of his trial in September 2001, his counsel learned of evidence that was material to his defense as articulated by Brady v. Maryland, 373 U.S. 83 (1963).  See Defendant Mel Lambert Velarde's Superceding Motion for New Trial ¶ 1, at 1.  Velarde alleged that the newly discovered evidence showed that, before Velarde's September 2001 trial began, the alleged victim, L.V., had made false allegations of inappropriate touching against a teacher and the assistant principal at her school in Dulce as a result of her displeasure over her teacher's initial refusal to let her watch the news coverage of 9/11 in the school library.  See id. ¶ 2, at 1.  Velarde alleged that further investigation indicated that Chimits was aware of the Brady evidence before the retrial began, but did not disclose the evidence to defense counsel as the Supreme Court required in Kyles v. Whitley, 514 U.S. 419, 438 (1995)(placing a duty on the prosecution to disclose material evidence even if that evidence is known only to police investigators).  See Defendant Mel Lambert Velarde's Superceding Motion for New Trial at 3.

On October 29, 2004, the United States responded to Velarde's motion for new trial and attached an affidavit from Chimits, stating that he was not aware of the alleged Brady evidence before the retrial began.  See United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial, Exhibit A.  In its response, the United States also argued that Velarde failed to meet the standards set out in Sinclair and Brady, and that Velarde did not provide any factual substantiation for his claims.  See id. at 2-3.

On May 6, 2005, Velarde filed a reply in support of  his motion for new trial, to which he attached Gallegos' affidavit in order to substantiate his claim that L.V. made false allegations of inappropriate touching against a teacher and vice principal at her school.  See Defendant Mel Lambert Velarde's Reply in Support of His Motion for a New Trial, Exhibit A.  Velarde also

attached a letter from the Superintendent of Dulce Schools stating that it was Dulce Schools' common practice to purge disciplinary records from student files at the end of each school year.  See id., Exhibit B.

On October 4, 2005, the United States filed a Surreply to Velarde's response to his motion for new trial.  See United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial, filed October 4, 2005 (Doc. 345)("United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial").  The United States argued that, under the Sinclair standard, the "new" evidence may not be merely impeaching in nature and that the accusation that Velarde's victim wrongly accused another individual of sexual abuse is classic impeachment evidence.  Id. at 4.  Thus, the United States argued that the Sinclair standard was not met.  See id.  The United States also argued that Velarde had not met the Brady standard for a new trial.  See id. at 1-3.

On October 20, 2005, Velarde filed a response to the United States' Surreply to Velarde's motion for new trial.  See Defendant's Response to United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial, filed October 20, 2005 (Doc. 348)("Defendant's Response to United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial").

On December 16, 2005, Judge Hansen issued an opinion setting an evidentiary hearing for February 1, 2006.  See Memorandum Opinion and Order, filed December 16, 2005 (Doc. 349).  On January 12, 2006, Judge Hansen issued a Memorandum Opinion and Order vacating the evidentiary hearing, scheduling a legal hearing on March 14, 2005, and requesting the parties to submit briefing regarding the ultimate admissibility of Velarde's newly discovered evidence.  See Memorandum Opinion and Order at 1-2, filed January 12, 2006 (Doc. 351).

-19-

On January 26, 2006, Velarde submitted his brief addressing the admissibility of L.V.'s false allegations to the Court, arguing that rule 412 of the Federal Rules of Evidence does not apply to L.V.'s false allegations and that Velarde's federal constitutional due process and cross-examination rights require the admission of this evidence without regard to rule 412. See Defendant Mel Lambert Velarde's Brief Addressing the Admissibility of L.V.'s False Allegations at 1-5, filed January 26, 2006 (Doc. 352). On February 9, 2006 the United States filed their response to Velarde's brief. See United States' Response to Defendant Mel Lambert Velarde's Brief Addressing the Admissibility of L.V.'s False Allegations, filed February 9, 2006 (Doc. 352). On February 26, 2006, Velarde filed his reply brief regarding the admissibility of L.V.'s false allegations. See Defendant Mel Lambert Velarde's Reply Brief Addressing the Admissibility of L.V.'s False Allegations, filed February 26, 2006 (Doc. 354). On April 12, 2006, Judge Hansen issued a Memorandum Opinion and Order denying Velarde's motion for new trial on the bases that Velarde's newly discovered evidence was not probative, was inadmissible under rule 608(b), 404(b) and 403, and because its admission was not mandated by the Confrontation Clause. See Memorandum Opinion and Order Denying Motion for New Trial at 10, filed April 12, 2006 (Doc. 357).

Velarde appealed Judge Hansen's decision. See Notice of Appeal, filed April 21, 2006 (Doc. 361). The Tenth Circuit vacated the district court's order denying Velarde's rule 33 motion, stating:

> We vacate the district court's order denying Mr. Velarde's Rule 33 motion and remand for proceedings consistent with the Brady analysis outlined above. We do not hold that Mr. Velarde is entitled to a new trial. We hold only that, on this record, the district court erred in holding that the suppressed evidence was immaterial without first either resolving the disputed question regarding whether the government suppressed information regarding L.V.'s supposed false accusations at school or allowing discovery to determine the nature and veracity of L.V.'s supposed accusations against her teacher and vice principal. The district court has broad discretion to determine the type and manner of any discovery.

United States v. Velarde, 485 F.3d 553, 563 (10th Cir. 2007).

On remand, the case was reassigned to Judge James O. Browning.  See Order at 1, filed September 6, 2007 (Doc. 387).  Velarde requested a number of subpoenas, all of which the Court issued.  See Defendant Mel Velarde's Ex Parte Motion for Issuance of Fed. R. Crim. P. 17(b) & (c) Subpoenas or, in the Alternative, a Request for Subpoenas or, in the Alternative, a Request for Subpoenas Under the All Writs Act, 28 U.S.C. § 1651, So Defendant Velarde Can Provide Evidentiary Support for his Motion for a New Trial and to Seal Pleadings, filed November 13, 2007 (Doc. 394); Order for Free Process, filed November 16, 2007 (Doc. 395).

Velarde moves the Court to order a new trial under rule 33(b)(1) of the Federal Rules of Criminal Procedure.  See Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 1.  Velarde requests that the Court grant his motion for a new trial or, at a minimum, hold an evidentiary hearing on the motion to assess the merits of his claim.  See id. at 7.  The Court held evidentiary hearings on December 13, 2007 and February 11, 2008. At the first hearing, the Court heard testimony from Frank Chimits, Tony Becerra, Antonio Pena and Phillip Gallegos.  Because William Reese was not able to attend the evidentiary hearing, the Court continued the hearing until February 11, 2008.  See Tr. at 233:10-12 (Court).

During the first hearing the Court asked both parties whether the law-of-the-case doctrine limited its ability to decide the Sinclair issue before it.  See Tr. at 14:21-25 (Court).  Velarde's counsel stated that the law of the case was based on Judge Hansen's ruling on September 5, 2007, which expanded the scope of the initially scheduled evidentiary hearing to include Sinclair issues.  See Tr. at 15:1-24 (Schoenburg).  The United States said that the Court should be prohibited from addressing Sinclair, because the Sinclair argument was not presented in Velarde's superceding motion for new trial.  See Tr. at 189:2-9 (Court & Fouratt). Velarde noted that the December 2007 hearing was the first hearing in which the United States had alleged Velarde had waived his right

for the Court to address the <u>Sinclair</u> issue by not timely raising the issue in his briefing.  <u>See</u> Tr. at 224:7-226:7 (Schoenburg).

In response to the Court's question regarding the applicability of rule 412, Velarde stated that he and the United States were in agreement that rule 412 comes into play only if the allegations of prior sexual conduct are in fact true.  Thus, in this case, where the allegations of prior sexual conduct are not true, rule 412 is not invoked.  <u>See</u> Tr. at 168:5-169:18 (Lowry, Schoenburg & Court).  The United States did not dispute that it was in agreement with the inapplicability of rule 412 if the allegations were proven false.

## <u>LAW REGARDING MOTIONS FOR A NEW TRIAL</u>

Motions for new trials are governed by the Federal Rules of Civil Procedure and by case law. Such motions are not favored.  The court must proceed with great caution before it sets aside a jury verdict, particularly where the defendant has already received two jury trials and been convicted both times.

**1.** **<u>Rule 33</u>**.

Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a) Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b) Time to File.**

**(1) Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

**(2) Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

-22-

Fed. R. Crim. P. 33 (bolded in original).  Any motion for a new trial grounded on newly discovered

evidence is timely if filed within three years after the verdict.  See Fed. R. Crim. P. 33(b)(1).  Under

rule 33, the district court has discretion to grant a new trial if the interests of justice require one. See

Fed. R. Crim. P. 33(a).

### 2.        Standards for Granting Motions for a New Trial.

Rule 33 authorizes trial courts to grant new trials "if the interest of justice so requires." Fed.

R. Crim. P. 33(a).  Courts have characterized motions for a new trial, including those under rule 33,

as ones "not regarded with favor and [which] should only be granted with great caution." United

States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir.1997)(citing United States v. Chatman, 994 F.2d

1510, 1518 (10th Cir. 1997)).  Motions for new trial filed more than seven days after a verdict or

a finding of guilt must be grounded on newly discovered evidence. See Fed. R. Crim. P. 33(b)(2).

For Velarde to prevail on a motion for a new trial based on newly discovered evidence under

United States v. Sinclair, he must show that:

> [(i)] the evidence was discovered after trial; [(ii)] the failure to learn of the evidence
> was not caused by his own lack of diligence; [(iii)] the new evidence is not merely
> impeaching; [(iv)] the new evidence is material to the principal issues involved; and
> [(v)] the new evidence is of such a nature that in a new trial it would probably
> produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531(internal quotations omitted).

"Evaluation of a Brady claim asserted in a motion for a new trial, [however] involves an

application of . . . three elements . . . and not the five-prong Sinclair test utilized in typical newly

discovered evidence claims." United States v. Quintanilla, 193 F.3d 1139, 1149  n.10 (10th Cir.

1999)(citing United States v. Robinson, 39 F.3d 1115, 1119 (10th Cir.1994)). To establish a

violation of Brady v. Maryland, 373 U.S. 83 (1963), a defendant must demonstrate: (i) the

prosecution suppressed evidence, (ii) the evidence was favorable to defendant, and (iii) the evidence

was material.  See United States v. Quintanilla, 193 F.3d at 1149 & n. 10.

> ### 3.      Law Regarding Motions for a New Trial Based on Alleged Brady Violations.

When the United States withholds evidence on demand of a defendant that, if made

available, would tend to exculpate him, such suppression of evidence can violate the defendant's

due-process rights.  See Brady v. Maryland, 373 U.S. at 87.  Upon the defendant's motion, the court

may vacate any judgment and grant a new trial if the interest of justice so requires.  See Fed. R.

Crim. P. 33(a).

A defendant seeking a new trial based on an alleged Brady violation has the burden to

demonstrate that: "[(i)] the prosecution suppressed evidence, [(ii)] the evidence was favorable to the

defendant, and [(iii)] the evidence was material."  United States v. Velarde, 485 F.3d 553, 558 (10th

Cir. 2007).  "An open file policy is neither mandated by the Constitution . . . nor is it ipso facto

constitutionally sufficient."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 828 (10th Cir.

1995)(internal citations and quotations omitted).  "While an open file policy may suffice to discharge

the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue."

Id.

> On the one side, showing that the prosecution knew of an item of favorable evidence
> unknown to the defense does not amount to a Brady violation, without more.  But the
> prosecution, which alone can know what is undisclosed, must be assigned the
> consequent responsibility to gauge the likely net effect of all such evidence and make
> disclosure when the point of "reasonable probability" is reached.  This in turn means
> that the individual prosecutor has a duty to learn of any favorable evidence known
> to the others acting on the government's behalf in the case, including the police.  But
> whether the prosecutor succeeds or fails in meeting this obligation . . . the
> prosecution's responsibility for failing to disclose known, favorable evidence rising
> to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. at 438 (internal citations omitted).

-24-

The United States' good faith or bad faith is irrelevant.  See Brady v. Maryland, 373 U.S. at 87.  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. at 433 (internal quotations omitted).  On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.  "'[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure' and it acts at its own peril by failing to comply adequately with an order requiring disclosure of Brady material." United States v. Lujan, 530 F.Supp.2d 1224, 1230 (D.N.M. 2008)(Brack, J.)(quoting United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988)).

Under Brady, the Supreme Court of the United States has held that an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. at 437.  "There is no Brady violation where the defendant knew or should have known of the material, exculpatory information or where the information was available to him from another source." United States v. Lujan, 530 F.Supp.2d at 1230 (citing United States v. Graham, 484 F.3d 413, 417 (6th Cir.2007)).

Impeachment evidence falls under Brady when the reliability of a given witness may be determinative of a defendant's guilt or innocence. See Giglio v. United States, 405 U.S. 150, 154 (1972). Brady obligates the prosecution to disclose "evidence affecting credibility." Id.

a.       **Suppression.**

The Tenth Circuit explained in <u>Smith v. Secretary of New Mexico Department of Corrections</u> that, "while proof the prosecutor had actual knowledge of the existence of the evidence at issue would be sufficient to establish the suppression element of a <u>Brady</u> claim, such proof is by no means necessary." 50 F.3d at 824. In <u>United States v. Hernandez-Muniz</u>, 170 F.3d 1007 (10th Cir. 1999), the Tenth Circuit found that the United States did not suppress information when it did not provide the defendant with his own statement made to an agent through discovery, but instead provided the defendant with the agent's statements at a preliminary hearing. <u>See id.</u> at 1010. The Tenth Circuit held that the United States did not suppress the defendant's statement, because it "provided the allegedly exculpatory information at the preliminary hearing" and "due process does not necessarily require disclosure in a specific form or manner." <u>Id.</u> at 1011.

Under <u>Kyles v. Whitley</u>, the prosecution's actual possession of the information is irrelevant. Every federal prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case." <u>Kyles v. Whitley</u>, 514 U.S. at 437. The "prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request." <u>United States v. Summers</u>, 414 F.3d 1287, 1304 (10th Cir. 2005)(citing <u>Scott v. Mullin</u>, 303 F.3d 1222, 1228 n.2 (10th Cir. 2002)).

The Constitution, however, "does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government.'" <u>United States v. Mayes</u>, 917 F.2d 457, 461 (10th Cir.1990)(quoting <u>Jencks v. United States</u>, 353 U.S. 657, 667 (1957)). A defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files. <u>See Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59 (1987). The <u>Brady</u> rule is not an evidentiary rule that grants broad discovery powers to

a defendant, because there "is no general constitutional right to discovery in a criminal case." Weatherford v. Bursey, 429 U.S. 545, 559 (1977). See United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("[T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. . . . The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.")(internal quotations and citations omitted), rev'd on other grounds by United States v. Bagley, 473 U.S. 667; Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir. 2000)("Brady does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up.").

Brady requires disclosure of information only in the government's possession or knowledge, whether actual or constructive. See United States v. Beers, 189 F.3d 1297, 1304 (10th Cir.1999); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n. 36 (noting that, because district attorney's office had actual knowledge that there was a separate investigation by authorities in a separate county, it was reasonable to impute knowledge possessed by the separate county to prosecution). "While a prosecutor cannot avoid his Brady obligations by keeping himself in ignorance or compartmentalizing information . . . neither does the government have an affirmative duty under Brady to seek out information that is not in its or its agents' possession." United States v. Lujan, 530 F.Supp.2d at 1231 (citing United States v. Graham, 484 F.3d at 415-18 (stating there is no affirmative duty to discover information in possession of independent, cooperating witness and not in government's possession))(internal citation omitted). See United States v. Moore, 25 F.3d 563, 569 (7th Cir.1994)(concluding Brady was not violated where both parties learned after trial that government witness had previous conviction for obstruction of justice and government did not

possess knowledge of this information until after trial); United States v. Baker, 1 F.3d 596, 598 (7th Cir. 1993)("Certainly, Brady does not require the government to conduct discovery on behalf of the defendant."); United States v. Flores, 540 F.2d 432, 437 (9th Cir. 1976)(noting that government has no duty to fish through public records equally accessible to defense to collate information).

The Brady doctrine is nonetheless interpreted broadly to encourage prosecutors to carry out their "'duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" United States v. Combs, 267 F.3d 1167, 1174-75 (10th Cir. 2001)(quoting Kyles v. Whitley, 514 U.S. at 437-38). "Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case." United States v. Beers, 189 F.3d at 1304. The Tenth Circuit in United States v. Beers held, however, that the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of Brady where there is no joint investigation by federal and state officials. See id. See also United States v. Romo, 914 F.2d 889, 899 (7th Cir. 1990)(holding that court did not err in denying request to compel prosecutors to make various inquires of local police in absence of showing by defendant that specific material, exculpatory information existed of which government knew). The Tenth Circuit in United States v. Beers, however, left open the question whether knowledge possessed by state officials would be imputed to the federal prosecutor where the federal government participated in a joint investigation with state officials. See 189 F.3d at 1304 n.2.

At least one court has held that a duty to search files maintained by governmental agencies closely aligned with the prosecution may be triggered when there is a reasonable prospect or notice of finding exculpatory evidence. See United States v. Brooks, 966 F.2d 1500, 1502-1504 (D.C. Cir. 1992). The Tenth Circuit quoted this holding from United States v. Brooks and indicated its

approval, but ultimately declined to definitively resolve the issue. See United States v. Combs, 267 F.3d at 1175. It is therefore an open question in this Circuit as to the extent of the government's duty to investigate files of state agencies participating in a joint investigation with federal officials.

> The United States Court of Appeals for the Sixth Circuit has held
>
> Brady and its progeny have recognized a duty on the part of the prosecutor to disclose material evidence that is favorable to the defendant over which the prosecution team has control. "But Brady clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."

United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2006)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir.1975))(emphasis added). In United States v. Graham, a witness cooperating with the United States failed to disclose fifteen boxes of records that he possessed. See 484 F.3d at 417. The Sixth Circuit held that the government did not suppress the records because they were not in the government's possession, even though the witness was cooperating and even though the government knew of the existence of the boxes in the witness' possession. See id. The Sixth Circuit stated that "'Brady is concerned only with cases in which the government possesses information which the defendant does not.'" Id. (quoting United States v. Mullins, 22 F.3d 1365, 1371 (1994)). The Sixth Circuit stated: "Further, there is no Brady violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." United States v. Graham, 484 F.3d at 417.

### b.    Favorability.

The evidence in question must be exculpatory or favorable to the defendant. See Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825; United States v. Gray, 52 Fed.Appx. 945, 947 (9th Cir. 2002)(holding that medical records of the alleged victim containing extensive impeaching evidence bearing on her ability and inclination to accurately and truthfully perceive, remember, and relate

what occurred were favorable to the defendant because they were impeachment material).  "It is precisely because defense counsel does not, and cannot, know what potentially exculpatory evidence the prosecutor possesses that there cannot realistically be any meaningful distinction between the prosecutor's obligation under Brady in a general request case and its obligation in a no request case." Smith v. Sec'y Dep't of Corr., 50 F.3d at 826-27 (internal quotations omitted).  The prosecution has an obligation to disclose obviously exculpatory evidence regardless whether the defense has requested it.  See id. at 827 (emphasis in original).

### c. Materiality.

"To make the materiality determination, [the court] view[s] the evidence's significance in relation to the record as a whole."  United States v. Hughes, 33 F.3d 1248, 1252 (10th Cir. 1994). Evidence is "material" for purposes of granting a new trial on an alleged Brady violation "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Velarde, 485 F.3d at 559 (internal quotations omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. (quotations and citations omitted).

"One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. at 435.  In evaluating materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Id. at 434. The Tenth Circuit notes:

Under this more flexible, sliding scale approach to assessing the materiality vel non

of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation. As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation. Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a <u>Brady</u> violation.

Smith v. Sec'y Dep't of Corr., 50 F.3d at 827.

Failure to disclose a specifically requested report is "seldom, if ever excusable." Id. at 830 (internal quotations omitted). "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." Scott v. Mullin, 303 F.3d 1222, 1230-31 (10th Cir. 2002)(internal quotations omitted).

When the subject matter on which a witness' credibility will be attacked is directly related to the central issue presented by the trial, the United States' theory of the case can be severely undermined. See United States v. Gurrola, No. 02-20044-01-CM, 2002 WL 31941469 at * 4 (D.Kan. December 16, 2002)(granting a new trial when the United States suppressed impeachment evidence addressing the credibility of a key government witness). When the issue at trial is the veracity of the allegation of sexual abuse, the United States Court of Appeals for the First Circuit has characterized the evidentiary value of suppressed false allegations as "very powerful" and "far more potent than a random unrelated episode of untruthfulness." Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003)(en banc opinion)(granting a new trial if the evidence of false allegations was admissible under state law); State v. Long, 140 S.W.3d 27, 28, 31 (Mo. 2004)(granting a new trial when the court excluded evidence of the alleged victim's false allegations because the witness' credibility was "the key factor in determining guilt or acquittal," and holding that the "defendant's constitutional right to present a full defense" must be honored). The Sixth Circuit, in granting a new

trial has held that, when "there is no physical evidence supporting the prosecution's case, the truthfulness or lack of truthfulness of the complainant is a matter of crucial importance." Mathis v. Berghuis, No. 02-1665, 2004 WL 187552 at ** 6-7 (6th Cir. January 7, 2004)(granting a new trial because evidence of the alleged victim's false allegations had been suppressed).

### d.      Motion for a New Trial Based on Alleged <u>Sinclair</u> Claims.

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence so long as that motion is presented within three years of the verdict of guilt. See Fed. R. Crim. P. 33(b)(1).  Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in United States v. Sinclair.  See 109 F.3d at 1531.  When a rule 33 movant presents such evidence, the court must determine whether he or she has met a five-part test; specifically, the defendant must show that: (i) the evidence was discovered after trial; (ii) it was not undiscovered before trial because of an absence of diligence on the movant's part; (iii) the evidence is not merely impeaching; (iv) it is material to principal issues involved; and (v) the evidence would probably have produced an acquittal.  See United States v. Quintanilla, 193 F.3d at 1147 (discussing the rule 33 test set forth in United States v. Sinclair, 109 F.3d at 1531).

### LAW REGARDING APPLICATION OF RULE 404(b)

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  Rule 404(b) of the Federal Rules of

Evidence provides:

> (b) **Other Crimes, Wrongs, or Acts**. -- Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b)(bold in original).

Rule 404(b) states that evidence of other crimes or wrongs may not be introduced against a person to show that, upon a later occasion, he or she acted in conformity with that prior behavior except to prove a number of enumerated issues.  A party introducing 404(b) evidence must show that: (i) the evidence is introduced for a proper purpose; (ii) the evidence is relevant; (iii) the evidence has probative value that is not substantially outweighed by the potential for unfair prejudice; and (iv) the party introducing the evidence must precisely articulate the purpose for which the evidence is offered.  See United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal defendant from risking conviction on the basis of evidence of his character.  See C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5239 (2007); United States v. Dudek, 560 F.2d 1288, 1295-96 (6th Cir. 1977).  In United States v. Phillips, 599 F.2d 134 (6th Cir. 1979), the Sixth Circuit noted, in addressing rule 404(b)'s precepts, that the rule addresses two main policy concerns:

> [i] That the jury may convict a "bad man" who deserves to be punished not because he is guilty of the crime charged but because of his prior or subsequent misdeeds; and [ii] That the jury will infer that because the accused committed other crimes he probably committed the crime charged.

599 F.2d at 136.

Accordingly, some courts have found that the standards for admission of evidence to show conduct in conformity with prior conduct relaxed when the defendant attempts to offer the rule 404(b) evidence. The United States Court of Appeals for the Second Circuit in United States v. Aboumoussallem, 726 F.2d 906 (2d Cir. 1984), undertook an early analysis of the admissibility of prior crimes evidence that the defendant proffers. The Second Circuit noted:

> [W]e believe the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when the prosecution uses such evidence as a sword. The prosecution in the Anglo-American tradition, may not ordinarily offer evidence of a defendant's prior wrongdoing for the purpose of persuading the jury that the defendant has a propensity for crime and is therefore likely to have committed the offense for which he stands trial. As Dean Wigmore points out, the evidence "is objectionable not because it has no appreciable value but because it has too much." Presumably, the "too much" argument means that a guilty person, and, of far more serious concern, an innocent person, may be convinced primarily because of the jury's willingness to assume his present guilt from his prior misdeed. Wigmore also identifies objections based on the risk that the jury will convict because the defendant may not have been punished for his prior offenses and the injustice of requiring the defendant to defend against a series of accusations. . . . However, the risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense. In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense.

726 F.2d at 911-12 (citations and footnotes omitted).

Similarly, the United States Court of Appeals for the Fifth Circuit in United States v. Krezdorn, 639 F.2d 1327 (5th Cir. 1981), cert. denied, 465 U.S. 1066 (1984), noted that

> [t]he extrinsic acts rule is based on the theory that the jury will use evidence that the defendant has, at other times, committed bad acts to convict him of the charged offense. Consequently, where the only purpose served by extrinsic offense evidence is to demonstrate the propensity of the defendant to act in a certain way, the evidence must be excluded. When, however, the extrinsic offense was not committed by the defendant, the evidence will not tend to show that the defendant has a criminal disposition and that he can be expected to act in conformity therewith. When the evidence will not impugn the defendant's character, the policies underlining 404(b) are inapplicable.

639 F.2d at 1332-33 (internal citations and quotations omitted). In addition to the Second and Fifth

Circuits, the United States Courts of Appeals for the First, Third, Seventh, and Eleventh Circuits have determined that rule 404(b) is inapplicable to admissibility of evidence of acts of third parties. See United States v. Reed, 259 F.3d 631, 634 (7th Cir. 2001)("In deciding whether to admit such evidence, a district court should balance the evidence's probative value under Rule 401 against considerations such as prejudice, undue waste of time and confusion of the issues under Rule 403."); United States v. Morano, 697 F.2d 923, 926 (11th Cir. 1993)("But although Rule 404(b) does not control this situation, the exceptions listed in the Rule should be considered in weighing the balance between the relevancy of this evidence and its prejudice under Rule 403."); United States v. Steven, 935 F.2d 1380, 1401-1406 (3d Cir. 1991)("[A] defendant may introduce "reverse 404(b)" evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations."); United States v. Gonzales-Sanchez, 825 F.2d 572, 582 n.25 (1st Cir. 1987)("Inasmuch as this evidence does not concern past criminal activity of [the defendant], Rule 404(b) is inapplicable."), cert. denied, 484 U.S. 989 (1987).  In United States v. Stevens, the Third Circuit also held that a lower standard of similarity between the crime before the federal court and the "other crimes evidence" governed "reverse 404(b)" evidence because prejudice to the defendant is not a factor.  935 F.2d at 1403.

The Tenth Circuit has held that rule 404(b)'s prohibition applies to a defendant who wishes to introduce evidence of wrongdoing by another to establish his innocence.  See United States v. Puckett, 692 F.2d 663, 671 (10th Cir. 1982), cert. denied, 459 U.S. 1091 (1982).  In United States v. Puckett, the co-defendant, Mauzy, sought to introduce evidence that he had been "conned" by his co-Defendant, Puckett, in transactions unrelated and dissimilar to the crimes charged in the indictment.  692 F.2d at 670.   The trial court did not allow Mauzy to present the evidence.  See id. at 670.  "The trial court did not permit Mauzy . . . to call certain witnesses who would testify that

they too had been 'conned' by Puckett in transactions unrelated and dissimilar to the crimes charged in the indictment." 692 F.2d at 670.

Mauzy contended on appeal in United States v. Puckett that "the refusal to admit this evidence violate[d] his due process right to present a defense." Id. at 670-71.  The Tenth Circuit affirmed.  See id. at 671.  The Tenth Circuit noted that the 404(b) evidence offered by Mauzy pertained to activities by Puckett that were "unrelated and dissimilar to the charges alleged in the indictment."  United States v. Puckett, 692 F.2d at 670.  Mauzy argued that rule 404(b) did not govern the admissibility of the evidence, because that rule did not apply "to situations in which a defendant wishes to introduce evidence of wrongdoing by another person in order to establish his own innocence." Id. at 671.  The Tenth Circuit indicated that it was "not inclined to interpret [rule 404(b)] so narrowly." Id.  The Tenth Circuit explained that its review of the "Advisory Committee Notes on the Proposed Rules [of Evidence] indicate[d] that the members of the committee were concerned not only with the prejudicial impact to a defendant in admission of extrinsic acts as evidence, but also with its limited probative value." Id.  The Tenth Circuit held that the trial court properly rejected the evidence as irrelevant, "[p]articularly . . . [where] the evidence offered by Mauzy pertained to activities by [his co-conspirator that were] unrelated and dissimilar to the charges alleged in the indictment." Id. at 671.

Since United States v. Puckett, the Tenth Circuit has considered the admissibility of prior acts proffered by the defendant, often referred to as "reverse 404(b)" evidence.  In United States v. Montelongo, 420 F.3d 1169 (10th Cir. 2005), police found ninety-three kilograms of marijuana in the sleeping compartment of the semi-truck that the defendants were driving.  See id. at 1171.  The owner of the truck testified for the United States, and stated that he "had inspected the truck just before [the defendants] picked it up and had found no marijuana in it." Id. at 1172.  The defendants

-36-

then made a "reverse 404(b)" argument.  420 F.3d at 1174.

The relevant issue in United States v. Montelongo was whether the defendants could cross examine the owner of the truck that the defendants were driving about a prior incident which occurred "a few months" earlier.  420 F.3d at 1171.  The defendants sought to introduce evidence of a prior incident which occurred a few months before their arrest and which involved marijuana that was found in the sleeping compartment in a different semi-truck that the truck owner possessed.  See id. at 1176.  The Tenth Circuit reversed the trial court's refusal to allow cross examination by the defendants regarding "the fact that thirty-four pounds of marijuana were found in duffle bags in the sleeping compartment of a truck owned by [the government witness] just a few months prior to the Defendants' arrests for nearly identical conduct" to defend against a conspiracy to distribute more than fifty grams of marijuana.  Id. at 1176.

The Tenth Circuit began its analysis in United States v. Montelongo by noting that rule 404(b)

is typically used by prosecutors seeking to rely on a criminal defendant's prior bad act as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in the crime charged.  The Rule is not so limited in its application, however, and evidence of a witness' other wrongs, acts, or crimes is admissible "for defensive purposes if it tends, alone, or with other evidence, to negate the defendant's guilt of the crime charged against him."

Id. at 1174.  The Tenth Circuit also noted that "[o]ther circuit courts addressing the issue hold that admissibility of reverse 404(b) evidence depends on a 'straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues.'"  Id. (quoting United States v. Stevens, 935 F.2d at 1404-1405).  The Tenth Circuit held that the evidence of the marijuana previously found in another truck owned by the truck owner was relevant to the defendants' defense that they had no knowledge of the marijuana packed in the truck that they

were driving.  See United States v. Montelongo, 420 F.3d at 1174.   The Tenth Circuit noted that, "[i]n this way, the previous case is relevant as it tends to make it less probable that the defendants knowingly possessed the marijuana or that they knowingly and voluntarily involved themselves in a drug conspiracy."  Id. at 1173.  The Tenth Circuit in United States v. Montelongo looked at the similarities between the charged matter and the previous incident.  See id. at 1174-75. The Tenth Circuit noted that there were several similarities between the two crimes and that the jury could believe that the owner had packed the marijuana in the semi-truck.  See id.

Specifically, the Tenth Circuit in United States v. Montelongo noted "the similarities between the two crimes and their temporal proximity . . . make . . . th[e] evidence probative."  Id. at 1174.   The Tenth Circuit based its opinion on common facts with the prior incident, such as: (i) both trucks were owned by the same person; (ii) the marijuana was packed in duffle bags; and (iii) the marijuana was hidden in the sleeping compartment of the cabin of both tractors.  See id. at 1172. The Tenth Circuit noted that "'a lower standard of similarity [between the crime at issue and 'other crimes' evidence] should govern 'reverse 404(b)' evidence because prejudice to the defendant is not a factor."  United States v. Montelongo, 420 F.3d at 1174-75 (quoting United States v. Stevens, 935 F.2d at 1404).

Lastly, the Tenth Circuit in United States v. Montelongo noted that the relevance of the proffered evidence was "not substantially outweighed by the risk of confusing the jury or the potential waste of time."  420 F.3d at 1175.  It noted that there was no danger of the jurors being distracted from the real issues in the case because of the similarities between the charged crime and the previous incident.  See id.  "To the contrary, [the 404(b) evidence] would have highlighted the central issue at trial -- namely, which man was responsible for the contraband."  Id.  The Tenth Circuit focused on the question of the evidence's admissibility in the context of the protections

afforded by the Sixth Amendment's Confrontation Clause and of cross-examination, and found that the "District Court erred in preventing the defendants from cross-examining [the truck owner] based on Rule 404(b)."   United States v. Montelongo, 420 F.3d at 1175.

In Agushi v. Duerr, 196 F.3d 754 (7th Cir. 1999), the United States Court of Appeals for the Seventh Circuit decided, as a matter of first impression, that rule 404(b) applied to acts of third parties.  See 196 F.3d at 760.  The Seventh Circuit began its analysis by noting that "[r]ule 404(b) speaks not of the parties to a case but of a 'person.'"  Id. (quoting Fed. R. Evid. 404(b)).  The Seventh Circuit noted that "[e]vidence regarding other crimes is admissible for defensive purposes if it 'tends, alone or with other evidence, to negate [the defendant's] guilt of the crime charged against him.'"  Id. (quoting United States v. Stevens, 935 F.2d at 1404)).  The Seventh Circuit explained that, although Huddleston v. United States, 485 U.S. 681 (1988) "involved a situation in which the defendant was the actor, the Court strongly suggested that Rule 404(b) should be applied to any actor."  Agushi v. Duerr, 196 F.3d at 760 (relying on Huddleston v. United States, 485 U.S. at 685-86 ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.")(emphasis in the original).  The Seventh Circuit concluded that, "[b]ased on the Supreme Court's guidance, our sister circuit's reasoning . . . as well as the very language contained in Rule 404(b), we hold that Rule 404(b) does apply to third parties." Agushi v. Duerr, 196 F.3d at 760.

In 2005, the Seventh Circuit, however, disagreed with a district court's evidentiary ruling that held the defense to as rigorous a 404(b) standard as the United States.  See United States v. Seals, 419 F.3d 600, 607 (7th Cir. 2005)("Contrary to the district court's statement, the defense is not held to as rigorous of a standard as the government in introducing reverse 404(b) evidence.")(citing

Agushi v. Duerr, 196 F.3d at 760).  The Seventh Circuit affirmed, however, the district court's decision to exclude the proffered evidence because it was irrelevant and inadmissible.  See  United States v. Seals, 419 F.3d at 607.  It noted that the similarities between the charged conduct and the previous incident were generic, because the underlying facts were dissimilar.  See id.  The Seventh Circuit explained that, although "the legal standard for admitting reverse 404(b) evidence is relatively lenient, the evidence still must be relevant."  419 F.3d at 607.

In United States v. McCourt, 925 F.2d 1229 (9th Cir. 1991), the United States Court of Appeals for the Ninth Circuit recognized that rule 404(b) makes no distinction between defendants and third parties in excluding prior-acts evidence to show criminal propensity or as a basis for suggesting the inference that certain conduct was in conformity with it.  See 925 F.2d at 1232 ("Because Rule 404(b) plainly proscribes other crimes evidence of 'a person,' it cannot reasonably be construed as extending only to 'an accused.'")(quoting Fed. R. Evid. 404(b)).  The Ninth Circuit noted, however, that there is no exception in rule 404(a) that would permit the use of evidence to show a third person's character for the inference that this person acted in conformity with his character and committed the crime with which defendant is charged.  See United States v. McCourt, 925 F.2d at 1231-32 n. 2 (citing 2 Weinstein & Berger, Evidence ¶ 404[04], at 404-39-40 (1989)).

In United States v. Stevens, the defendant sought to introduce testimony by a victim of a crime different from the one with which the defendant was charged where the victim "was the victim of a crime which was so similar to the instant crime that the investigating officers believed that the same individual had committed both" and the victim "would have testified that he, unlike the [other] victims . . . did not identify [the defendant] as his assailant."  935 F.2d at 1383.  "The critical question [wa]s, of course, one of degree of similarity."  Id. at 1401.  The United States Court of Appeals for the Third Circuit held that the "district court imposed too stringent a standard of

-40-

similarity on [the defendant]." Id. at 1404.  The Third Circuit held that "a lower standard of similarity should govern 'reverse 404(b)' evidence because prejudice to the defendant is not a factor." Id. The Third Circuit then stated that "a defendant may introduce 'reverse 404(b)' evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations." Id. at 1405.  The Third Circuit rejected the United States' contention that a defendant may offer rule 404(b) evidence only under "hard and fast preconditions," and stated:

> More specifically, the defendant, in order to introduce other crimes evidence, need not show that there has been more than one similar crime, that he has been misidentified as the assailant in a similar crime, or that the other crime was sufficiently similar to be called a "signature" crime.  These criteria, although relevant to measuring the probative value of the defendant's proffer, should not be erected as absolute barriers to its admission.  Rather, a defendant must demonstrate that the "reverse 404(b)" evidence has a tendency to negate his guilt, and that it passes the Rule 403 balancing test.

Id. The Third Circuit determined that the defendant's proffer was relevant under rule 401 because it made his guilt less probable.  See id. at 1405-1406.  It then determined that the proffer did not present a risk of mini-trials or obstruction to the orderly progress of trial.  See id. The Third Circuit emphasized that its "resolution of this issue [wa]s informed by [its] general belief that a criminal defendant should be able to advance any evidence that, first, rationally tends to disprove his guilt, and second, passes the Rule 403 balancing test." Id. at 1406.

In United States v. Moreau, No. CR 07-388 JB, Memorandum Opinion and Order (public version), filed March 12, 2008 (Doc. 201)(D.N.M. 2008)(Browning, J.)("Moreau Memorandum Opinion and Order"), the Court found that Moreau was able to introduce, under rule 404(b), three incidents of a witness' involvement in the distribution of drugs.  See Moreau Memorandum Opinion and Order at 26.  Moreau sought to offer the evidence as proof that the witness was a co-conspirator, with another individual, to distribute marijuana, and that Moreau was "an ignorant, and innocent,

-41-

secondary driver of the tractor trailer" that contained the marijuana. Id. at 21. The first incident Moreau wanted to introduce involved the arrest of the witness and another individual in August of 1985. See id. at 2. During that incident, a search of the witness' vehicle revealed that it contained twenty-five to thirty pounds of marijuana. See id. The second incident Moreau wanted to introduce involved the witness' 1987 conviction for conspiracy to distribute cocaine, conspiracy to distribute marijuana, and for the filing of false tax returns. See id. This conviction involved the continued distribution of cocaine and marijuana over a period between 1979 and 1985. See id. The third incident was a charge against the witness of marijuana possession for sale in Guadalupe, Arizona. See id.

Moreau was charged with conspiracy to possess with intent to distribute more than 100 kilograms of marijuana and with possession of a controlled substance with the intent to distribute it. See Court's Final Jury Instruction (GIVEN), filed March 13, 2008 (Doc, 206). On February 11, 2007, Moreau and his friend were stopped while driving a tractor-trailer rig at a Port of Entry outside of Gallup, New Mexico. See Moreau Memorandum Opinion and Order at 3. A subsequent search of the trailer revealed approximately 2700 pounds of marijuana separated into approximately fifty discrete bundles. See id.

In his attempt to present the 404(b) evidence, Moreau argued that the prior crimes and acts by the witness are similar to the crime with which he was charged. See id. at 6. Moreau explained that he intended to offer the evidence, not to attack the witness' character for truthfulness, but to show opportunity, plan preparation and knowledge under 404(b). See Moreau Memorandum Opinion and Order at 7.

In reaching its decision, the Court stated: " The Tenth Circuit has indicated that rule 404(b) is applicable to evidence a defendant wishes to introduce that relates to wrongdoings by another to

-42-

establish his innocence." Id. at 19 (citing United States v. Puckett, 692 F.2d at 671).   Furthermore, the Court stated that rule 404(b) "'is not so limited in its application, however, and evidence of a witness' other wrongs, acts, or crimes is admissible for defensive purposes if it tends, alone, or with other evidence, to negate the defendant's guilt of the crime charged against him.'"   Moreau Memorandum Opinion and Order at 19 (quoting United States v. Montelongo, 420 F.3d at 1174). The Court also stated that it was not prepared to adopt a relaxed standard for reverse 404(b) evidence without more explicit direction from the Tenth Circuit.   See Moreau Memorandum Opinion and Order at 20.

The United States in United States v. Moreau argued that the witness' criminal history was irrelevant, because the temporal proximity of the witness' criminal history and Moreau's charged conduct was separated by a period of years, as opposed to a number of months as was the case in United States v. Montelongo.   See Moreau Memorandum Opinion and Order at 22.   The United States also argued that the evidence Moreau sought to introduce was factually distinct from United States v. Montelongo, because Moreau sought to introduce evidence about the witness' prior conduct involving marijuana found in a hotel room and in a vehicle, which were different from the charged conduct involving a tractor trailer.   See Moreau Memorandum Opinion and Order at 22-23. The United States noted that the charged conduct in United States v. Montelongo had common facts with the prior incident that was admitted in that both trucks were owned by the same person, the marijuana was packed in duffle bags in both incidents, and the marijuana was hidden in the sleeping compartment of the cabin of both tractors.   See Moreau Memorandum Opinion and Order at 23.

The Court in United States v. Moreau ultimately held that the fact that the proffered crime was separated from the crime in federal court by a period of years was irrelevant, and that temporal proximity is not the determinative factor that should govern admissibility.   See id.   The Court also

held that the evidence of the prior crimes and acts by the witness were sufficiently similar to the crime with which Moreau was charged for it to be admissible under rule 404(b).  See id. at 23-24.

Additionally, the Court stated that "'[r]elevant evidence' means evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moreau Memorandum Opinion and Order at 24 (quoting Fed. R. Evid. 401).  The Court held that, because the witness' criminal history makes the witness' involvement in the federal offense more likely, and might make Moreau's involvement less likely, it was relevant.  See Moreau Memorandum Opinion and Order at 24.

## LAW REGARDING THE MANDATE RULE AND THE LAW-OF-THE-CASE DOCTRINE

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)(internal quotations omitted). "Thus[,] when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995). "The practice [of law of the case] is not rigidly binding, but generally an appellate court will not depart from a rule of law established on an earlier appeal in deciding the same issues, except for cogent reasons." Bromley v. Crisp, 561 F.2d 1351, 1363 (10th Cir. 1977), cert. denied, 435 U.S. 908 (1978).

The law-of-the-case doctrine is a rule based on sound public policy that litigation should come to an end, Todd Shipyards v. Auto Transport, S.A., 763 F.2d 745, 750 (5th Cir. 1985), and is

designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided,  Major v. Benton, 647 F.2d 110, 112 (10th Cir. 1981). The law-of-the-case doctrine seeks to preserve the finality of judgments, to prevent "continued re-argument of issues already decided . . . and to preserve scarce court resources." Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d 1128, 1132 (10th Cir. 2001)(applying law-of-the-case doctrine)(internal quotations and citations omitted); United States v. Triangle Oil, 277 F.3d 1251, 1259 (10th Cir. 2002)("Courts use law of the case to promote decisional finality and rely on it to prevent relitigation of an issue already decided in prior proceedings of the same case.")(internal quotations omitted).

The mandate rule is an "important corollary" of the law of the case doctrine and "provides that a district court must comply strictly with the mandate rendered by the reviewing court." Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d at 1132. "The mandate rule is a discretion-guiding rule that generally requires trial court conformity with the articulated appellate remand." United States v. Hicks, 146 F.3d 1198, 1200 (10th Cir. 1998)(internal quotation marks omitted).  "'When the remand is general, however, the district court is free to decide anything not foreclosed by the mandate.'" Hicks v. Gates Rubber Co., 928 F.2d 966, 971 (10th Cir. 1991).  But cf. Field v. Mans, 157 F.3d 35, 40 (1st Cir. 1998) ("We review an application of the law of the case de novo.").

"To decide whether the district court violated [an appellate court's] mandate, it is necessary to examine the mandate and then look at what the district court did." Hicks v. Gates Rubber Co., 928 F.2d at 969.  See Barber v. Int'l Bhd. of Boilermakers, 841 F.2d 1067, 1071 (11th Cir. 1988) ("As should be apparent, the application of these mandate rule principles will, in accord with the rule's purpose of promoting finality, depend considerably on the stage a case has reached when it goes up on appeal and on the language of the appellate court's mandate and/or opinion.").

A mandate from the Tenth Circuit consists of the instructions to the district court at the

conclusion of the opinion, and the entire opinion that preceded those instructions. See Barber v. Int'l Bhd. of Boilermakers, 841 F.2d at 1071. Although a district court is bound to follow the mandate, and the mandate "'controls all matters within its scope . . . a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal.'" Procter & Gamble Co. v. Haugen 317 F.3d 1121, 1126 (10th Cir. 2003)(quoting Newball  v. Offshore Logistics Int'l, 803 F.2d 821, 826 (5th Cir. 1986). See Hicks v. Gates Rubber Co., 928 F.2d at 966 (noting that, with a general mandate, the district court "is free to decide anything not foreclosed by the mandate")(internal quotations omitted).

"Generally, 'once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case.'"  Wessel v. City of Albuquerque, 463 F.3d 1138, 1143 (10th Cir. 2006)(quoting Grigsby v. Barnhart, 294 F.3d 1215, 1218 (10th Cir. 2002)). "Unlike res judicata, the [law-of-the-case-doctrine] is not an 'inexorable command,' but is to be applied with good sense." United States v. Monsisvais, 946 F.2d 114, 117 (10th Cir. 1991)(quoting Major v. Benton, 647 F.2d 110, 112 (10th Cir. 1981)). "Accordingly, the doctrine is subject to three exceptions: '[(i) when the evidence in a subsequent trial is substantially different; [(ii)] when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or [(iii)] when the decision was clearly erroneous and would work a manifest injustice.'" Wessel v. City of Albuquerque, 463 F.3d at 1143 (quoting Grigsby v. Barnhart, 294 F.3d at 1219 n.4). The Tenth Circuit  reads "these exceptions narrowly, requiring district courts to apply the law of the case unless one of the exceptions specifically and unquestionably applies." United States v. Monsisvais, 946 F.2d at 117 (internal quotations omitted).

## ANALYSIS

Velarde asks the Court to grant him a new trial for two reasons: (i) he can satisfy the three

prongs of the Brady standard; and (ii) he can satisfy the five prongs of the Sinclair standard. The United States contends that Velarde falls short of both standards. Because the Court believes that Velarde cannot prove that the United States possessed or suppressed the newly-discovered evidence, but is able to satisfy all the requirements of the Sinclair standard, the Court will grant Velarde a new trial under Sinclair.

# I.   THERE IS A SUFFICIENT RECORD FOR THE COURT TO RULE ON VELARDE'S MOTION FOR A NEW TRIAL.

The United States initially asserted that, beyond its failure to meet either of the standards for a new trial, Velarde's motion suffers from a more fundamental defect -- it is missing any sort of factual substantiation. See United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 1-2. Regardless how Velarde initially brought the newly discovered information to the Court, however, he has now provided the Court with sufficient information to entice it to seriously entertain the possibility that false allegations were made by L.V. against other persons. He has now offered sworn statements and other support for his accusation that Chimits was told of this evidence, yet hid it from both the defense and the prosecution. Subsequent filings include the affidavit of Phil Gallegos which substantiates Velarde's contention that L.V. made false allegations of inappropriate touching against a teacher and vice principal at her school and that Chimits was told of such false allegations before trial. See Gallegos Aff. ¶ 6, at 2.

While the United States may have been correct, at the time its response was filed, that Velarde's accusations are self-serving, his assertions now have enough substance to them for the Court to take them seriously. Velarde has presented appropriate evidence for factual consideration. The Court is prepared to move beyond the problems with the record, if any, and move to the merits and apply the standards for a new trial. Velarde has presented enough evidence to warrant the Court

-47-

holding an evidentiary hearing on the merits of his arguments regarding newly discovered evidence.

The United States initially argued that Velarde asserted a <u>Brady</u> violation to bypass the requirements for a motion for a new trial under <u>United States v. Sinclair</u>. <u>See</u> United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 3.   It is wrong to suggest, however, that Velarde is avoiding the legal standard set forth in <u>United States v. Sinclair</u>.  The Court notes, from Gallegos' affidavit and his testimony at the December 13, 2007 hearing, that Velarde has properly asserted a <u>Brady</u> violation supported by asserted facts in the record.  Velarde's factual evidence is sufficient for the Court to consider whether constitutional relief under <u>Brady</u> is warranted.

### A.   THE UNITED STATES DID NOT SUPPRESS THE NEWLY DISCOVERED EVIDENCE.

The first prong of <u>Brady</u> requires Velarde to prove that the prosecution suppressed evidence. <u>See</u> <u>United States v. Velarde</u>, 485 F.3d at 558.  One of the bases for Velarde's motion for a new trial is that Chimits was aware of <u>Brady</u> evidence before the retrial began.  <u>See</u> Defendant Mel Lambert Velarde's Superceding Motion for a New Trial ¶ 3, at 1-2; Gallegos Aff. ¶ 6, at 2; Tr. at 111:23-113:3 (Gallegos & Schoenburg).  Gallegos alleges that he told Chimits about L.V.'s false allegations before Velarde's second trial.  <u>See</u> Tr. at 112:2-20 (Schoenburg & Gallegos). Specifically, Gallegos alleges he told Chimits that L.V. had made unfounded allegations of inappropriate touching against a couple of teachers at Dulce School.  <u>See</u> Tr. at 112:2-15 (Gallegos & Schoenburg).  Velarde contends, pursuant to rule 33(b)(1), that this information about L.V.'s unfounded allegations of inappropriate touching against a male teacher and a male vice principal is newly discovered evidence that was favorable to him, material to his defense, specifically communicated to Chimits before trial, and was wrongly withheld from him.  <u>See</u> Defendant Mel Lambert Velarde's

-48-

Superceding Motion for a New Trial at 1-2.

Chimits and Gallegos' testimony is, in most respects, identical -- until the testimony about the very end of their conversation. On that aspect, Chimits' testimony, in important respects, contradicts Gallegos' testimony and the allegations in Velarde's motion. While Gallegos states that he specifically told Chimits that L.V. falsely accused several teachers of inappropriate touching, Chimits testified otherwise. See Gallegos Aff. ¶ 6, at 2; Tr. at 112:2-20 (Schoenburg & Gallegos). Chimits testified Gallegos told him only that L.V. had been in trouble and that she had been sent to the principal's office. See Tr. at 35:6-36:1 (Schoenburg & Chimits). During his testimony at the evidentiary hearing on December 13, 2007, Chimits made clear that, at no time during his conversation with Gallegos, did Gallegos tell him that L.V. had made allegations of sexual touching against anyone at Dulce School. See Tr. at 52:6-10 (Chimits & Carson McNabb). Chimits also testified that at the time Gallegos told him that L.V. had gotten into trouble at school, he was already aware that L.V. had been in trouble at school and had been sent to the principal's office. See id. at 36:7-20 (Schoenburg & Chimits). Before speaking with Gallegos that day, Chimits had been informed by L.V.'s teacher and vice principal Pena that L.V. had gotten in trouble for being disruptive in class. See id. at 48:16-49:19 (Carson McNabb & Chimits). Additionally, Chimits testified that, had he received any information that the trouble regarding L.V. involved sexual touching, he would have sought out the individuals involved in the allegations, informed the United States Attorney's Office, and recorded it pursuant to FBI policy. See id. at 48:5-12 (Carson McNabb & Chimits).

Both Gallegos and Chimits were credible witnesses, but the Court believes that Chimits' recollection of the conversation was more accurate on the critical aspect of what was not said. The Court believes their conversation was a case where two men were talking, nodding, and using

abbreviated sentences or phrases, and did not communicate well.  When Gallegos used the phrase "in trouble," he meant the false allegations; what Chimits thought Gallegos was referring to, however, was the trouble about which he had been previously told by Pena and L.V.'s teacher regarding  L.V. disrupting class and being sent to the principal's office.  When Chimits told Gallegos that he knew about the "trouble" he indeed knew about some trouble, but not the false accusations.  When Gallegos had the impression that Chimits already knew about the "trouble," his impression was correct, but the two men were talking about different incidents of "trouble."

Because the Court believes that Chimits' testimony is credible, that he was never told that L.V. had made false allegations of sexual touching against male individuals at school, Velarde cannot meet the standards to prove a <u>Brady</u> violation.  The Court has carefully considered the evidence that Velarde has presented, and has made factual findings and conclusions that are not in his favor on the suppression issue.  The Court believes that the record, which contains Chimits' affidavit in 2004 and testimony in 2007, counsels for a rejection of Velarde's <u>Brady</u> accusation. Given the Court's factual findings, Velarde cannot argue with vigor that a new trial is required under <u>Brady</u>.  Because the Court has not credited Gallegos' testimony -- that he told Chimits that L.V. made false accusations of inappropriate touching against two school employees -- Velarde must acknowledge that a constitutional violation did not occur. Investigation of the newly discovered evidence has disclosed that the United States did not suppress evidence, but rather that Agent Chimits did not possess this newly discovered evidence because no one told him of L.V.'s false accusations.  Thus, the first element of <u>Brady</u>, that requires Velarde to prove that the prosecution suppressed evidence, is not satisfied.  <u>See</u> <u>United States v. Velarde</u>, 485 F.3d at 558.

Velarde argues, that even if the Court finds Chimits' testimony credible, there was still a <u>Brady</u> violation because Chimits had a duty to ask Gallegos what kind of trouble L.V. had been

involved in.  See Tr. at 177:16-178:9 (Court & Schoenburg).  Velarde contends "[Chimits] can't

avoid Brady by just saying, see no evil, hear no evil, and covering his eyes and ears and moving on

. . . he either has to disclose it or make further inquiry, but he can't just pass it by."  Id. at 182:24-

183:2 (Schoenburg).

        The United States argues that Chimits had previously inquired into the trouble in which L.V.

was involved.  See id. at 197:12-23 (Court & Fouratt).  The United States argues that no Brady

violation should be found when a police officer reasonably elects in his mind not to pursue what the

defense, six years later, says would have been a fruitful line of inquiry.  See Tr. at 199:13-17

(Fouratt).  Furthermore, the United States argues that a Brady violation cannot be based on a

negligent mindset, but rather that there has to be some kind of acknowledgment, by a member of the

United States Attorney's team, that at the end of a particular evidentiary path there may be evidence

that is exculpatory to the defendant, and thus, the United States will not to pursue that path.  See Tr.

at 199:18-25 (Fouratt). The United States represents that such a situation is not in the evidence

before the Court.  See id. at 199:24-25 (Fouratt).

        While the Court is in agreement with Velarde that a government agent is not permitted to

hide his or her head in the sand so as not to acquire information that he or she should disclose to the

defense, an agent is also not required to make every inquiry to seek out information that is not in his

or her possession.  As recently as January of 2008, the Honorable Robert Brack, United States

District Judge for the District of New Mexico, stated "the government [does not] have an affirmative

duty under Brady to seek out information that is not in its or its agents' possession, Graham, 484

F.3d at 415-18  (stating there is no affirmative duty to discover information in possession of

independent, cooperating witness and not in government's possession)." United States v. Lujan, 530

F.Supp.2d at 1231 (citing  United States v. Graham, 484 F.3d at 415-18).  The evidence before the

Court shows that Chimits was not in possession of the information regarding L.V.'s false allegations. The Court finds that Chimits had no duty to further investigate Gallegos' comment regarding the trouble in which L.V. was involved. The Court finds it reasonable for Chimits not to further investigate the "trouble" that Gallegos mentioned to him, because he had recently been told, by L.V.'s teacher and by Pena, of a specific incident of trouble in which L.V. had been involved, and likely believed Gallegos was referring to the same incident.

It is not reasonable to evaluate in hindsight the conversation between Gallegos and Chimits, and decide that a comment about trouble required Chimits to investigate further the nature of the trouble mentioned. Because Chimits already possessed information about L.V. being in trouble, and because Gallegos did not give any detail about the trouble other than that L.V. was sent to the principal's office, Chimits' failure to do any further investigation was reasonable. Furthermore, it was reasonable for Chimits to believe that the defense was also aware of this same trouble, because he knew that the defense had been talking to teachers and was actually calling several of them to testify regarding their opinion for L.V.'s truthfulness. That Chimits did not further inquire into the type of trouble referred to by Gallegos was not a <u>Brady</u> violation in itself. Thus, the Court denies Velarde's motion for new trial on the basis of a <u>Brady</u> violation.

## II.   VELARDE HAS ESTABLISHED THAT HE IS ENTITLED TO A NEW TRIAL <u>UNDER</u> SINCLAIR.

While the Court does not believe that Velarde satisfies the standards under <u>Brady</u>, the Court concludes that Velarde is entitled to a new trial under <u>Sinclair</u>. For the Court to grant Velarde a new trial under <u>Sinclair</u>, Velarde must establish: (i) the evidence was discovered after trial; (ii) it was not undiscovered before trial because of an absence of diligence on Velarde's part; (iii) the evidence is not merely impeaching; (iv) it is material to principal issues involved; and (v) the evidence would

probably have produced an acquittal.  See United States v. Quintanilla, 193 F.3d at 1147 (discussing

the rule 33 test set forth in United States v. Sinclair).  The Court believes that, based on the facts

before it, Velarde can establish the five prongs of Sinclair and thus is entitled to a new trial.

> **A.    THE LAW OF THE CASE AND THE TENTH CIRCUIT'S MANDATE ALLOW THE COURT TO DECIDE WHETHER VELARDE IS ENTITLED TO A NEW TRIAL UNDER SINCLAIR.**

The Court believes that, under the law of the case, and the mandate of the Tenth Circuit, it

is able to determine that Velarde is entitled to a new trial under the Sinclair standard.  The mandate

of the Tenth Circuit stated:

> We VACATE the district court's order denying Mr. Velarde's Rule 33 motion and REMAND for proceedings consistent with the Brady analysis outlined above.  We do not hold that Mr. Velarde is entitled to a new trial.  We hold only that, on this record, the district court erred in holding that the suppressed evidence was immaterial without first either resolving the disputed question regarding whether the government suppressed information regarding L.V.'s supposed false accusations at school or allowing discovery to determine the nature and veracity of L.V.'s supposed accusations against her teacher and vice principal.  The district court has broad discretion to determine the type and manner of any discovery.

United States v. Velarde, 485 F.3d at 563.   The language of the Tenth Circuit's mandate

demonstrates that it did not determine whether Velarde was entitled to a new trial, and determined

only  that it should remand the case for proceedings consistent with the Brady analysis and that the

district court had broad discretion to determine the type and manner of any discovery.

In following the Tenth Circuit's mandate, the Court held two evidentiary hearings.  The

Court gave Velarde liberal use of the Court's subpoena powers to bring witnesses to the hearings.

During the evidentiary hearings, the Court determined that the United States had not suppressed

Brady evidence and thus Velarde was not entitled to a new trial on the basis of Brady.  Based on the

evidence presented during the evidentiary hearings, however, the Court determined that Velarde was

entitled to a new trial under Sinclair.  The Court does not violate the law of the case doctrine or the

mandate rule by making this determination.  Rather, the Court's decision regarding Velarde's right to a new trial under Sinclair promotes judicial efficiency and justice.

The law of the case doctrine is a restriction self-imposed by the courts in the interests of judicial efficiency.  See Messinger v. Anderson, 225 U.S. at 444; Bromley v. Crisp, 561 F.2d at 1363.  It is a rule based on sound public policy that litigation should come to an end, see Todd Shipyards v. Auto Transp., S.A., 763 F.2d at 750, and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided. See Major v. Benton, 647 F.2d at 112.  The law-of-the-case doctrine seeks to preserve the finality of judgments, to prevent "continued re-argument of issues already decided . . . and to preserve scarce court resources." Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d at 1132 (applying law of the case doctrine)(internal quotations and citations omitted). See United States v. Triangle Oil, 277 F.3d at 1259 ("Courts use law of the case to promote decisional finality and rely on it to prevent relitigation of an issue already decided in prior proceedings of the same case.")(internal quotations omitted).

The mandate rule is an "important corollary" of the law of the case doctrine and "provides that a district court must comply strictly with the mandate rendered by the reviewing court." Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d at 1132. "The mandate rule is a discretion-guiding rule that generally requires trial court conformity with the articulated appellate remand." United States v. Hicks, 146 F.3d at 1200 (internal quotations omitted).  "[W]hen the remand is general, however, the district court is free to decide anything not foreclosed by the mandate." Hicks v. Gates Rubber Co., 928 F.2d at  971 (internal quotations and citations omitted).

"To decide whether the district court violated [an appellate court's] mandate, it is necessary to examine the mandate and then look at what the district court did." Hicks v. Gates Rubber Co., 928 F.2d 969. See Barber v. Int'l Bhd. of Boilermakers, 841 F.2d at 1071 ("As should be apparent,

the application of these mandate rule principles will . . . depend considerably on the stage a case has

reached when it goes up on appeal and on the language of the appellate court's mandate and/or

opinion.").

A mandate from the Tenth Circuit consists of the instructions to the district court at the

conclusion of the opinion, and the entire opinion that preceded those instructions. See Barber v. Int'l

Bhd. of Boilermakers, 841 F.2d at 1071.  Although a district court is bound to follow the mandate,

and the mandate "'controls all matters within its scope . . . a district court on remand is free to pass

upon any issue which was not expressly or impliedly disposed of on appeal.'" Procter & Gamble

Co. v. Haugen, 317 F.3d at 1126 (quoting Newball  v. Offshore Logistics Int'l, 803 F.2d at 826).

See Hicks v. Gates Rubber Co., 928 F.2d at 966 (noting that, with a general mandate, the district

court "is free to decide anything not foreclosed by the mandate")(internal quotations omitted).

The Tenth Circuit has not expressly or impliedly determined Velarde's right to a new trial

under Sinclair.  Nor does the Tenth Circuit's mandate foreclose this Court's ability to make such a

determination.  By determining that Velarde is entitled to a new trial under Sinclair the Court is not

determining an issue that has already been decided by the Tenth Circuit.  The Tenth Circuit

determined that the district court erred by failing to grant leave to conduct discovery stating:

"'[W]here specific allegations before the court show reason to believe that the petitioner may, if the

facts are fully developed, be able to demonstrate that he is' entitled to a new trial, 'it is the duty of

the court to provide the necessary facilities and procedures for an adequate inquiry.'" United States

v. Velarde, 485 F.3d at 560 (quoting Harris v. Nelso, 394 U.S. 286, 299 (1969))(internal quotations

omitted).

At the time the Tenth Circuit remanded Velarde's case, it did not know specifically what

evidence would be produced through the discovery granted by this Court.  The evidence that was

produced at the evidentiary hearings, however, proved to satisfy the <u>Sinclair</u> standard while falling short of the <u>Brady</u> standard.  Furthermore, the Court notes that the Tenth Circuit stated:

> Even assuming [extrinsic evidence of  L.V.'s false accusations] would not be admissible, discovery could have led to facts that the defense could use to effectively cross-examine L.V. about her truthfulness.  While Rule 608(b) makes this type of cross examination subject to the district court's discretion, it may well be an abuse of discretion not to allow such cross-examination in a criminal case where the vast majority of inculpatory evidence is the alleged victim's testimony.

<u>United States v. Velarde</u>, 485 F.3d at 563**.**

The Court also notes that the possibility of a new trial under <u>Sinclair</u> is not one that the Court is raising sua sponte.  Rather, the <u>Sinclair</u> standard has been briefed on numerous occasions throughout this litigation.  The <u>Sinclair</u> standard was first mentioned in Velarde's superceding motion for a new trial.  <u>See</u> Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 2-3.  While it is clear that the focus of Velarde's motion for a new trial was on <u>Brady</u>, rather than <u>Sinclair</u>, the Court does not read Velarde's motion as foreclosing his ability to request a new trial under <u>Sinclair</u> or disclaiming all intent in doing so.  The <u>Sinclair</u> standard was again discussed in the United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial.  <u>See</u> Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 2.  Specifically, in its response, the United States set out the <u>Sinclair</u> standard and argued that Velarde could not meet such a standard, because he could not prove that the new evidence was not merely impeaching or that admission of the evidence would likely produce an acquittal.  <u>See id.</u> at 2-5.  Additionally, the United States argued that Velarde alleges a <u>Brady</u> claim to "artfully attempt . . . to pass on the rigid <u>Sinclair</u> standard and its dispositive exclusion of the impeachment evidence Velarde presents."  <u>Id.</u> at 3.

In Velarde's reply, he mentioned the <u>Sinclair</u> standard in further detail, stating that he is not

alleging a <u>Brady</u> claim to avoid the requirements of <u>Sinclair</u>, but rather, because the facts of the case indicate that relief under <u>Brady</u> is warranted.  <u>See</u> Defendant Mel Lambert Velarde's Reply in Support of his Motion for a New Trial at 2.  In his reply, Velarde also discussed the "merely impeaching" and "likelihood of acquittal" elements of <u>Sinclair</u>.  <u>Id.</u> at 4-6.

In the United States' Surreply, it stated: "[T]he government respectfully submits that the appropriate standard by which Velarde's motion should be ultimately denied remains the <u>Sinclair</u> standard."  United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 1.  Velarde's response to the United States' Surreply stated that the <u>Brady</u> and <u>Sinclair</u> issues are mutually exclusive and even if the court were to hold that his <u>Brady</u> claim fails, it may still determine that a new trial is warranted under <u>Sinclair</u>.  <u>See</u> Defendant's Response to United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 1, 5-8.  Finally, Velarde addressed the <u>Sinclair</u> standard in his Memorandum in Support of his Motion for a New Trial.  <u>See</u> <u>id.</u> at 7-9.

Additionally, on September 5, 2007, at a status conference, Judge Hansen determined that, at the evidentiary hearing, he would hear evidence regarding both <u>Brady</u> and <u>Sinclair</u> and would make a ruling on each.  <u>See</u> Clerk's Minutes, filed September 5, 2007 (Doc. 388)(stating that "[a]t the evidentiary hearing, the Court will consider and rule on <u>Brady</u> evidence and then will hear evidence and make ruling under <u>Sinclair</u>.").

At the December 13, 2007 hearing, Velarde argued that Judge Hansen's ruling, that both doctrines were to be considered, constitutes the rule of the case.  <u>See</u> Tr. at 15:1-6 (Schoenburg). The United States argued that, because the <u>Sinclair</u> doctrine was only cited in Velarde's motion for new trial and not argued, that the Court should not consider whether Velarde is entitled to a new trial under <u>Sinclair</u>.  <u>See</u> Tr. at 189:2-25 (Court and Fouratt).  The Court finds that the extensive briefing

of the Sinclair issue by both parties and Judge Hansen's decision, in open court, stating that he would rule on the Sinclair issue, support the Court's decision to rule on the Sinclair issue.

Furthermore, the Court notes that the Tenth Circuit stated: "'[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is' entitled to a new trial, 'it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" United States v. Velarde, 485 F.3d at 560 (quoting Harris v. Nelso, 394 U.S. 286, 299 (1969). Through the facilities and procedures provided to Velarde by the Court, the Court finds that Velarde has presented evidence that establishes his right to a new trial under Sinclair.

Additionally, the Tenth Circuit acknowledged that evidence, which was not before it at the time it decided this motion, could change the posture of the case. United States v. Velarde 485 F.3d at 563 (stating that: "Even assuming such evidence would not be admissible, discovery could have led to facts that the defense could use to effectively cross-examine L.V. about her truthfulness."). While the Court notes that the Tenth Circuit made this comment in relation to a Brady analysis, the Court believes that such language is still instructive because it demonstrates the Tenth Circuit's acknowledgment that discovery, and the related proceedings, could change the situation of the case and lead the Court in a different direction. Thus, the Court believes it was instructed by the Tenth Circuit to act on the information before it and grant a new trial based on Sinclair. The Tenth Circuit noted that this case fits into a rare class of cases in which the defendant is entitled to the opportunity for an adequate inquiry into the necessity for a new trial. See United States v. Velarde, 485 F.3d at 560. Because these cases entitled to such an inquiry are so rare, it was impossible for the Tenth Circuit to craft a specific mandate that would encompass all the possibilities that the district court could face. The Court believes, however, that by granting Velarde a new trial based on Sinclair it

-58-

has followed the instructions of the Tenth Circuit and has acted in the interest of justice.

Finally, while the Court has been concerned about the Tenth Circuit's mandate and the law-of-the-case doctrine, the United States has not raised these issues. The United States has not argued that the Tenth Circuit's mandate or the law-of-the-case doctrine precludes consideration of the Sinclair basis for a new trial. Rather, after the Court brought up the issue of the effects of the law-of-the-case doctrine, the United States focused its argument on the fact that Velarde should be prohibited from having the Court rule on his Sinclair issues because he failed to timely raise the issue in briefing. See Tr. at 189:5-191:5 (Court & Fouratt). After careful review of the mandate rule, the law-of-the-case doctrine, and the extensive briefing on the Sinclair issue in this case, the Court does not see any impediment to considering Velarde's new trial motion under Sinclair.

## B. THE NEW EVIDENCE WAS DISCOVERED AFTER TRIAL IN THE SPRING OF 2004.

Velarde alleges that, "[i]n the spring of 2004, well after Defendant Mel Velarde's trial in September of 2001, defense counsel learned of evidence that was material to his defense." Defendant Mel Lambert Velarde's Superceding Motion for a New Trial ¶ 1, at 1. The United States acknowledges that it has no reason to question Velarde's assertion that the evidence was discovered in the Spring of 2004. See United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 4. Thus, the Court finds, and the United States concedes, that the new evidence was discovered after trial. Velarde, therefore, satisfies the first prong of the Sinclair standard. See United States v. Quintanilla, 193 F.3d at 1147.

## C. THE NEW EVIDENCE DID NOT REMAIN UNKNOWN BEFORE TRIAL BECAUSE OF VELARDE'S LACK OF DILIGENCE.

The United States acknowledges that it has no basis to assert that the new evidence remained unknown before trial because of Velarde's lack of diligence. See United States' Response to

-59-

Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 4.  While the United States complains that, between the Spring and September of 2004, Velarde could have developed and presented to the Court factual support -- if it exists -- to allow the Court to possibly rule in his favor and to allow the United States a better opportunity to examine the merits of his position, there does not appear to be any dispute that Velarde exercised due diligence.  See id.  Accordingly, the United States has conceded that the proffered evidence is new evidence that could not have been duly discovered before trial.  Velarde has thus proved that the new evidence did not remain unknown before trial because of his lack of diligence and thus satisfies the second prong of the Sinclair standard. See United States v. Quintanilla, 193 F.3d at 1147.

### D.   THE NEW EVIDENCE IS NOT MERELY IMPEACHING AND IS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 404(b).

The United States attempts to downplay the value of the new evidence by casting it as mere impeachment evidence.   See United States' Surreply to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 4. The United States alleges that the accusation that L.V. had wrongly accused another individual of sexual abuse would only be usable by Velarde during cross-examination of L.V. and thus is classic impeachment evidence.  See id. The Court notes, however, that this trial was, a "she said -- he said" situation where the credibility of witnesses in general, and L.V.'s credibility, in particular, was the hotly contested  issue.  Without any physical evidence that indicated, implied, or hinted that L.V. had been sexually assaulted, impeaching the credibility of the witnesses was the only effective means for either party to make its case.

As the newly discovered evidence is admittedly material to the issues that were the focal point of, and contested at trial, the Court will not deny Velarde a new trial by characterizing the new evidence as merely impeaching.  Rather, the Court believes that this evidence may be offered as

-60-

substantive evidence under 404(b) to show L.V.'s knowledge, motive, and capacity to concoct a false allegation.[7]

1.    **Velarde Must Establish that His New Evidence is Admissible Under Rule 404(b).**

As in United States v. Moreau, the Court remains unprepared to say that it should adopt a relaxed standard for reverse 404(b) evidence without more explicit direction from the Tenth Circuit. See Moreau Memorandum and Opinion at 20. Thus, the standards governing 404(b) evidence are applicable to Velarde's proffer of L.V.'s false accusations. A party introducing 404(b) evidence must show that: (i) the evidence is introduced for a proper purpose; (ii) the evidence is relevant; (iii) the evidence has probative value that is not substantially outweighed by the potential for unfair prejudice; and (iv) the party introducing the evidence must precisely articulate the purpose for which the evidence is offered, See United States v. Hardwell, 80 F.3d at 1488.

2.    **Velarde Seeks to Introduce the Evidence of L.V.'s False Accusations of Inappropriate Touching for the Proper Purpose of Demonstrating that L.V. had the Motive, Knowledge and Capacity to Concoct Such False Accusations.**

Velarde states that he seeks to admit evidence of L.V.'s false accusations of inappropriate touching against Becerra and Pena to establish that L.V. had the motive, knowledge and capacity

---

[7] Velarde would not appear to be able to introduce the specific acts to which his newly discovered evidence refers under 404(a). While evidence of the character of an alleged victim may be admitted for the purposes of proving action in conformity therewith on a particular occasion, see Fed. R. Evid. 404(a)(2)("In a criminal case, and subject to the limitations imposed by Rule 412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor."), it may be proved only by evidence in the form of opinion or reputation, see Fed. R. Evid. 404(a)(3), 608(a). While the United States could go into specific instances of conduct on cross examination, see Fed. R. Evid. 608(b), the United States would have no incentive to do so and most likely, would be careful not to open the door to such testimony.

to concoct false allegations that adult males acted inappropriately towards her to get what she wanted.  See Tr.2 at 61:1-13 (Schoenburg).  Velarde alleges that the evidence that L.V. falsely accused her teacher and vice principal of misconduct, because the teacher and vice principal had frustrated her ability to get what she wanted, highlights Velarde's contention that L.V. falsely accused him.  At trial, Velarde argued that L.V. was motivated to fabricate the charges against him, because he ruined L.V.'s ability to be with her mother all of the time.  L.V. could not sleep with her mother when Velarde spent the night, and L.V. was frightened to sleep alone.  Similarly, L.V. accused Becerra of inappropriately touching her when he refused to immediately grant her request to watch television coverage of September 11th.

The United States counters that other acts are admissible under 404(b) only if there is evidence to support a finding by the jury that the similar act was committed and that the other act is probative of a material issue other than character.  See United States' Memorandum of Law on Questions Arising From Evidentiary Hearing on Motion for New Trial at 10.  The United States argues that showing L.V.'s manipulative or vengeful nature is showing an attribute of a person's character, and thus is impermissible under 404(b).  See id.  Furthermore, the United States argues that Velarde has failed to present any evidence of motive.  See id.

While Velarde may not introduce the evidence of L.V.'s false accusations of improper touching for the improper purpose of demonstrating that she acted in conformity with her prior acts, Velarde may offer the evidence to demonstrate one of the proper purposes recognized under rule 404(b), "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  Velarde has indicated he intends to introduce the evidence to demonstrate that L.V. had the "motive, knowledge, [and] capacity to concoct" a false allegation involving inappropriate behavior by adults to get what she wanted.  Tr.2

at 61:1-4 (Schoenburg). The Court believes that Velarde has a proper purpose for seeking admission of L.V.'s false allegations of improper touching and that he does not seek to introduce the false allegations to prove L.V.'s conformity therewith.

While Velarde has articulated one or more proper purposes, the more serious issue is whether Velarde truly needs the newly discovered evidence to prove these legitimate issues. In other words, are these issues "phantom" issues or real issues. The Court concludes that Velarde has not only articulated legitimate purposes for the newly discovered evidence, but he also has established that the purposes are actual issues in the case and are not mere makeweight issues to skirt the reasons for and restrictions in rule 404, and get into the record what is mere propensity evidence.

The Court finds most persuasive Velarde's contention that he needs to establish that L.V. had the capacity to formulate false allegations. At the second trial, the United States made much of the fact that L.V. was young and unable to concoct a false allegation against Velarde. See Velarde Letter at 4-5. Velarde needs this newly discovered evidence to rebut this contention by the United States that L.V. did not have the capacity, because of her age, maturity, or otherwise, to concoct a false allegation against Velarde.

It is true that rule 404(b) does not specifically mention proof of "capacity" or ability as a permissible purpose. The list in rule 404(b), however, is not exhaustive. See Fed. R. Evid. 404(b) ("It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"); United States v. James, 217 Fed.Appx. 776, 778 (10th Cir. 2007)(quoting United States v. Sarracino, 131 F.3d 943, 949 (10th Cir. 1997))("However, we recognize the purposes expressly identified in [r]ule 404(b) are not exclusive, and instead, the rule is one of inclusion, rather than exclusion, unless the evidence is introduced for an impermissible purpose or is unduly prejudicial.")(internal quotations omitted).

Given the importance of the issues about her capacity or ability at the second trial, and the centrality of her credibility at trial, the Court does not believe Velarde is attempting to introduce this evidence to prove a "phantom" issue.

The Court also believes that Velarde should be permitted to introduce the newly discovered evidence to prove her motive.  While introduction of motive evidence in many cases looks very similar to propensity evidence, in this case, Velarde is attempting to show that L.V. had a motive to make a false allegation in the past and had a similar motive in making the false allegations against Velarde.  In other words, the newly discovered evidence shows that she had a motive -- getting her way -- not that she had used a similar technique in the past.

Rule 404(b) evidence almost always has the incidental effect of proving the character of a person to show conformity therewith.  This incidental effect, however, is not a good ground for excluding the  introduction of the evidence for proper purposes.  Any problem with the jury using the 404(b) evidence for an improper purpose can be eliminated or sufficiently mitigated with a limiting instruction.

### 3.   L.V.'s False Accusations of Inappropriate Touching are Potentially Relevant to L.V.'s Allegations Against Velarde.

The United States contends that the situation involving the false accusations made by L.V. occurred three years after the crime committed by Velarde and bears little, if any, resemblance to the charge Velarde was convicted of.  See United States' Memorandum of Law on Questions Arising From Evidentiary Hearing on Motion for New Trial at  at 11.  At the December 13, 2007 hearing, the United States also argued that the false allegations made by L.V. against Becerra and Pena, and the situation with Velarde, were different because "[t]here's no sex . . . . There's no sexual smoke . . . [T]his was just  . . . the girl didn't like what happened to her done by two school

-64-

personnel. That doesn't translate to these are similar allegations to him taking off her pajamas." Tr. at 221:12-18 (Fouratt). Thus, the United States argues that Velarde has failed to present any evidence of a similar act. See id.

As the Court previously noted in its Memorandum Opinion and Order in United States v. Moreau (Doc. 201), "[t]here is no magic number to satisfy temporal proximity. Rather, proximity is one of a number of factors the Court must weigh in determining the probative value of the proffered evidence." Id. at 23 (citing United States v. Montelongo, 420 F.3d at 1174 (noting that "the similarities between the two crimes and their temporal proximity [is what] makes th[e] evidence probative.")). Thus, the Court finds that the fact that the proffered false accusation is separated from Velarde's alleged crime by a period of years irrelevant, and the Court does not believe temporal proximity, in this case, is the determinative factor that should govern admissibility.

Furthermore, the Court finds that L.V.'s false accusations against Becerra and Pena and L.V.'s allegedly false accusation against Velarde are similar acts. Evidence that L.V. falsely accused her teacher and vice principal of misconduct, because the teacher and vice principal had frustrated her ability to get what she wanted, highlights Velarde's contention that L.V. falsely accused him.

At trial, Velarde argued that L.V. was motivated to fabricate the charges against him because he ruined L.V.'s ability to be with her mother all of the time. L.V. could not sleep with her mother when Velarde spent the night, and she was frightened to sleep alone. Similarly, L.V. accused Becerra of inappropriately touching her when he refused to immediately grant her request to watch the television coverage of September 11th. Both situations involve L.V. falsely accusing adult males who have acted in a way that prevents L.V. from getting what she wants. In both situations, L.V. (i) made a false accusation; (ii) to a third party; (iii) against an adult male; (iv) of inappropriate

sexual contact; (v) to get what she wanted.

It is true that the situation with Becerra and Pena did not, it now appears, specifically involve sex.  The Court does not believe the actual situation is the relevant touchstone.  The more relevant evidence is what her accusation was.  The record before the Court, indicates her accusation, included the words or was intentionally meant to leave the impression of, "inappropriate touching," in reference to the situation with Becerra and Pena.  The Court believes that a reasonable jury could find that an allegation by a female student of "inappropriate touching" or even "touching" by a male of a young girl, suggests that the contact was of a sexual nature.  Thus, the Court finds that these situations are sufficiently similar to be admissible under 404(b).

Furthermore, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact  that is of consequence to the determination of the action more probable or less probable than it would be without evidence." Fed. R. Evid.  401.  L.V.'s false accusations of inappropriate touching may make the likelihood of L.V. having falsely accused Velarde more plausible.  Accordingly, L.V.'s false accusations are relevant.

### 4.        The Evidence of L.V.'s False Accusations has Probative Value that is Not Substantially Outweighed by the Potential for Unfair Prejudice.

Rule 403 of the Federal Rules of Evidence does not preclude Velarde's proffer of the evidence of L.V.'s false accusations.  The United States argues that, pursuant to rule 403, the Court should not permit Velarde to introduce L.V.'s false allegations, because the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the United States and of confusion of the issues for the jury.  See Tr.2 at 71:19-25 (Torres).  The Court finds the evidence of L.V.'s false accusations very probative.  The risk of confusion, waste of time, and/or distraction of the jurors as a result of the introduction of such evidence should not be a significant factor at trial.

-66-

Given the testimony regarding the false allegations, and the similarity between the false accusations and the allegedly false accusation against Velarde, the Court will allow the evidence because its probative value is not significantly outweighed by potential of unfair prejudice to the United States. After receiving all relevant testimony from the evidentiary hearings, the United States can adequately prepare for the introduction of such evidence and thus will not be unfairly prejudiced by the introduction of such evidence.  Thus the admission of L.V.'s false allegations should not be precluded on the basis of rule 403.

### 5.    Velarde has Precisely Articulated the Purpose for Which he Seeks to Offer the Evidence of L.V.'s False Accusations of Inappropriate Touching.

Velarde has specifically indicated the purposes for which he seeks to offer L.V.'s false accusations of inappropriate touching.  Velarde states that he seeks to admit this evidence to establish that L.V. had the motive, knowledge and capacity to concoct false allegations against adult males of acting inappropriately towards her to get what she wanted.  See Tr.2 at 61:1-13 (Schoenburg).  Rule 404(b) allows introduction of such evidence for reasons  "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).  Thus, Velarde has articulated specific purposes for seeking to introduce L.V.'s false allegations of inappropriate touching.

### E.    THE NEW EVIDENCE OF L.V.'S FALSE ACCUSATIONS OF INAPPROPRIATE TOUCHING IS MATERIAL.

The United States recognizes that, if the new evidence exists, the new evidence is  material.  The United States concedes that the proffered evidence is material in the context of this case.  See United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 4-5 (stating that "the United States recognizes the materiality of the new evidence if it exists as

asserted in Velarde's motion."). The United States admits the new evidence is material under the Sinclair standard. See United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 4-5. The evidence of L.V.'s false allegations is material evidence under 404(b) to demonstrate L.V.'s motive, knowledge and ability to concoct false allegations.

Additionally, the Court notes that other Circuits have found that even merely impeaching evidence can be material in specific Brady situations. While the Court acknowledges that it is operating under a Sinclair standard rather than a Brady standard, the Court believes such findings to be instructive. And while the newly discovered evidence is not merely impeaching, but can be used to impeach, the Court notes that even merely impeaching evidence can be considered material in certain contexts. See United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004)(stating that, "if the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material.").

L.V.'s credibility was a central theme, if not the central theme, of the defense. This situation requires the Court to assess the strength of the United States' case. The Court need not, as Velarde argues, find that the United States' case against him was weak. It is sufficient for the Court to note that the United States' case rested primarily on L.V.'s credibility as a prosecution witness. Compared to the evidence that the United States presented during the September 2001 retrial, which consisted of allegations that L.V. chewed gum in violation of the class rules and failed to do her homework, the impeachment value of two false allegations of inappropriate touching could have been extraordinary.

L.V.'s false allegations could have played a pivotal role in undermining her credibility had Velarde's defense counsel been aware of them. The false allegations of improper touching at school could have cast doubt on L.V.'s ability to be truthful about the issue that was before the jury:

whether Velarde had inappropriately touched L.V.

If Velarde had this information, he could have argued that, resentful of a teacher's initial refusal to agree with L.V.'s request to watch television, she fabricated an allegation of inappropriate touching.  Velarde could have argued that, if L.V. fabricated allegations of improper touching because a teacher hesitated to allow her to watch television, a relatively petty source of resentment, she had the motivation, capability and knowledge to fabricate the charge against Velarde for displacing L.V. from her mother's side in her mother's bed.  No other evidence at trial either duplicated or compared to the impact that this evidence could have had in the minds of the jury.

Without the evidence of false allegations of adults inappropriately touching her body, the impeachment evidence presented against L.V. by the defense was limited.  In the mind of the jury, the white lies that Velarde presented to the jury could have been explained as normal behavior for an adolescent girl.  It would be more difficult for the jury to so easily dismiss the false allegations of being fondled by adults in  positions of authority over L.V.  False allegations of being fondled are not lies that the jury would be able to easily dismiss as normal adolescent behavior.

To gauge how important L.V.'s credibility was during this trial, the Court focused on the United States' character witnesses.  Their opinion could have been subject to a devastating critique by Velarde's counsel had those counsel known that L.V. had made false allegations of improper touching against their colleagues within the school system within weeks of the trial.  Thus, because the evidence is material evidence under 404(b) and material as impeachment evidence, the Court finds that the newly discovered evidence is material under <u>Sinclair</u>.

## F.    THE NEW EVIDENCE WOULD PROBABLY HAVE PRODUCED AN ACQUITTAL.

The Court's finding that the new evidence is material does not end the inquiry.  The Court

must also evaluate the fifth prong of the <u>Sinclair</u> standard.  Velarde must also show that the admission of the evidence would likely have produced an acquittal.  In assessing whether that is likely the case, the Court notes that this was a case in which there was no physical evidence that implicated Velarde and that L.V. provided the sole uncorroborated testimony that Velarde had raped her.  Additionally, during the United States' closing argument, the Assistant United States Attorney suggested how difficult it would have been for L.V. to create such a complicated false allegation against Velarde and that the easier and more logical explanation was that Velarde, in fact, raped her. <u>See</u> Velarde Letter at 4-5.

Had the defense been able to present the evidence of L.V.'s false allegations of being inappropriately touched by a teacher and a school administrator, Velarde could have both impeached L.V.'s credibility and shown that she had the knowledge, motive, and capability to falsely accuse Velarde.  Accordingly, because this evidence was not presented during the second trial, the jury was unable to assess realistically whether L.V.'s allegation that Velarde sexually abused her was true. The new evidence would likely produce an acquittal, because Velarde lacked a real ability to prove that L.V. had a tendency to prevaricate about such substantive matters.

The United States contends that L.V. was subjected to "a rigorous cross-examination" at trial. United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for a New Trial at 5.  The colloquy presented to the Court, however, is not the rigorous questioning that the Court would expect if Velarde had known that L.V. had made false allegations of inappropriate touching against her school teacher and vice principal.  Having the ability to show that L.V. was motivated to falsify allegations of inappropriate behavior to punish adults who deprived L.V. of the things that she wanted would have been devastating to L.V.'s credibility as a witness as well as to the United States' argument that it was very unlikely that L.V. could have created such a false

allegation against Velarde.   Such impeachment and demonstration of motive, knowledge, and capability could have played an important role in the jury's deliberations and verdict because such evidence was material to the charge.

The United States argues that Velarde likely would not have been acquitted because Harrison testified that Velarde had also assaulted her when she was a child.  See United States' Response to Defendant Mel Lambert Velarde's Superceding Motion for New Trial at 5.  The Court notes, however, that Harrison's testimony was not without problems for the jury to consider.  See Defendant Mel Lambert Velarde's Reply in Support of His Motion for a New Trial at  5. First, she delayed twenty years before reporting the incident. See id.  Second, Harrison and her family had a longstanding feud with Velarde's family over whose family would possess and control one of the largest working ranches on the Jicarilla Apache Reservation.  See id.  A reasonable juror could have thought that, by putting Velarde in prison, Harrison may have thought that her family would have a serious opportunity to regain control and possession of the ranch.  See id.  Given the background of Harrison's testimony, the Court cannot say that it would have foreclosed an acquittal.

In any event, the trial was primarily about L.V.'s allegations, not about Harrison's.  To the extent the jury was inclined to believe Harrison's testimony, her testimony raises the likelihood that Velarde was convicted for "crimes other than those charged -- or that, uncertain of guilt, [the jury convicted] anyway because a bad person deserves punishment."  United States v. Guardia, 135 F.3d 1326, 1330-31 (10th Cir. 1998)(quoting Old Chief v. United States, 519 U.S. 172, 181 (1997)).  The impeachment of L.V. with the current allegations of fabrication, as well as a showing that she had the motive, knowledge, and capacity to make such false allegations, could have presented such prejudice and avoided the injustice of a possible wrongful conviction because it would have portrayed Velarde's alleged reality of this case: L.V. fabricated her allegations against Velarde to

-71-

end the terrifying prospect of having to sleep without her mother when Velarde came to spend the night at their home.

While the Court has found that the United States has not suppressed the evidence and committed a violation under <u>Brady</u>, the Court believes that this case warrants a new trial under <u>Sinclair</u>.  There was no other defense evidence before the Court as powerful as that which Velarde recently discovered.  Had the defense been privy to that information during the September 2001 retrial, there is a reasonable probability that the outcome of the trial would have been different.

**IT IS ORDERED** that the Defendant's Motion for a New Trial is granted.  The Court held evidentiary hearings on December 13, 2007, and February 11, 2008, to elaborate on Velarde's contentions.  While Velarde is not entitled to a new trial under <u>Brady</u>, he has proven that he is entitled to a new trial under <u>Sinclair</u>.  Velarde is granted a new trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
Gregory J. Fouratt
  United States Attorneys
J. Miles Hanisee
Glynette R. Carson-McNabb
Presiliano Torrez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Peter Schoenburg
Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom
  Schoenburg & Bienvenu, LLP
Albuquerque, New Mexico

     *Attorneys for the Defendant*